**JEWISH WAR VETERANS OF the UNITED STATES of America, et al., Plaintiffs,**

v.

**UNITED STATES of America, et al., Defendants.**

Civ. A. No. 87–1561.

United States District Court, District of Columbia.

Aug. 30, 1988.

See also, 695 F.Supp. 1.

---

**4**

Ronald J. Koerner, Rose & Koerner, Brooklyn, N.Y., Stanley H. Tashoff, Gaithersburg, Md., for plaintiffs.

Frederick M. Morgan, Jr., Vincent M. Garvey, Elisa B. Vela, U.S. Dept. of Justice, Civ. Div., Washington, D.C., Lt. Col. Keith Sexton, Judge Advocate Div., U.S. Marine Corps, Arlington, Va., for defendants.

## MEMORANDUM OPINION

THOMAS F. HOGAN, District Judge.

Plaintiffs challenge the constitutionality of a Latin cross, 65 feet tall and brightly lit each night, serving as a war memorial at Camp H.M. Smith, a United States Marine Corps base in Hawaii. Unfortunately, the government's choice of the principal and universally recognized symbol of Christianity to achieve a secular goal cannot withstand Establishment Clause scrutiny in this instance. Accordingly, under Supreme Court precedent the Court is compelled to require that the cross be removed or replaced by a nonreligious symbol.

### Background

This action was brought by the Jewish War Veterans of the United States of America (JWV) and Maxwell Feuerman,[1] a JWV member who lives in Hawaii, against the United States government, the Secretary of the Navy, and the Commandant of the Marine Corps. Plaintiffs seek a writ of mandamus to the Secretary of the Navy to remove the cross forthwith and an injunction. The case is before the Court on cross-motions for summary judgment, which have been fully briefed and argued.

A cross has stood on Bordelon Field at Camp Smith in the suburbs of Honolulu for 22 years. Although the parties are in agreement on many factual matters, they are in disagreement on the origin of the

---

1. Feuerman's name was misspelled "Feurman" in the Complaint.

cross and on certain other points. Ultimately, these disputes are not material to the outcome of the case, because even accepting defendants' version of all contested matters the Court's ruling would be the same.

Camp Smith is on the island of Oahu in the suburbs of Honolulu in an area known as Halawa Heights. The base also is the headquarters of the Fleet Marine Force, Pacific. Base facilities include Bordelon Field, a sports and ceremonial field carved from the side of a mountain.

Near the center of Bordelon Field is the Latin cross at issue in this case. Its upright part is 65 feet tall and the transom part measures 35 feet across. It is lit from dusk until dawn by florescent lights. The parties do not agree about how visible the cross is to motorists on a nearby freeway, to ships at sea, and to such areas as Pearl Harbor, Pearl Ridge Shopping Center, and Aloha Stadium, but they do agree that the cross is a landmark visible beyond the confines of the Camp. The parties agree that Bordelon Field has been used as the site for religious services, but disagree about whether the cross has served as a backdrop for those services.

The principal disagreement, concerning the origin of the cross 22 years ago, arose only recently, after the Judge Advocate General of the Navy determined in late 1985 that the Establishment Clause compelled removal of the cross. The controversy resulting from that decision prompted a former Commanding General of the Fleet Marine Force, Pacific, Victor H. Krulak, to publicly review the history of the cross, which he said was built with a secular purpose as a Vietnam war memorial.

Plaintiffs rely on an account of the erection of the cross based largely on a March 22, 1979, news release of the Base Public Affairs Office, reproduced as Exhibit (Exh.) 2 to Plaintiffs' Motion for Summary Judgment.[2] The six-page release evidently is the basis for the other documents supporting plaintiffs' account, an October 11, 1985, Marine Corps memo (Exh. 8), a letter from the Commanding General to a Con-

gressman dated May 27, 1981 (Exh. 9), and a letter from the Camp Commander to a Senator dated May 21, 1986 (Exh. 10).

According to this account, now discounted by defendants as inaccurate "folklore" and "misinformation," the cross was built in April, 1966, for Easter sunrise services to which the public was invited. Allegedly, the Catholic chaplain, Father Pius F. Keating, was the force behind the cross. According to the base maintenance electrician, Tony Clark, Keating "scrounged everything we needed to construct the cross.... Military buses from all branches of the service traveled to bases all over the island to transport more than 5,000 servicemen and women to the Easter sunrise service."

According to the news release, the cross remained lit throughout the night during the two-week Easter season; when Clark or another maintenance worker forgot to turn it on, citizens called wanting to know what happened to the cross. In fact, according to the news release, the cross evoked such a favorable reaction from the local community that it was decided to illuminate it year round.

In 1969, however, the Commanding General received an objection from a Jewish naval officer that the cross violated the doctrine of separation of church and state; as a result, the general directed that it be lit only during the Christmas and Easter seasons. According to the news release, that decision "ignited a fuse among local residents and they took their case to U.S. Senator Hiram L. Fong." The release quoted a letter to Fong characterizing the cross as "the landmark around which we've built our homes and our hopes." Despite the protests, the cross remained unlit except for the Easter and Christmas seasons for two years.

On March 26, 1972, the cross was rededicated (and relit) as an expression of concern for American prisoners of war (POWs) and servicemen missing in action (MIAs) in Southeast Asia, according to the news release. The relighting by Lt. Gen. William K. Jones, then Commanding General of the

---

**2.** Unless otherwise specified, exhibits are to Plaintiffs' Motion for Summary Judgment.

Fleet Marine Force, Pacific, coincided with then-President Nixon's "National Week of Concern for Americans Who Are Prisoners of War or Missing in Action."

The cross was darkened in 1974 as a result of the energy crisis. The cross was lit only during Christmas and Easter until the crisis subsided; in 1975, nightly lighting resumed from dusk until dawn.

In early 1983 the original cross was destroyed by a fire traced to an electrical short. *See* Exh. 18. The Marines spent $13,000 in public funds to rebuild the cross, finishing the job on December 15, 1983. Said the Camp Commander in a congratulatory letter to the local commander of Navy Public Works: "The new cross is larger and much brighter than its predecessor. Being erected just before the Christmas season reflected superb timing. Its message and symbolism enrich relationships between the Camp and its surrounding community." (Exh. 14.)

On August 27, 1985, members of the Jewish Community Relations Council of the Jewish Federation of Hawaii met with the Camp Commander to raise Establishment Clause concerns. Two days later, the local Staff Judge Advocate submitted a memorandum to the Camp Commander, and on September 3, 1985, the Camp Commander submitted a memorandum to the Commanding General, Marine Corps Bases, Pacific, seeking advice. On October 21, 1985, the Commanding General requested a legal opinion from the Judge Advocate General of the Navy.

On December 6, 1985, Admiral T.E. Flynn, Navy Judge Advocate General, determined that the cross violated the First Amendment. General P.X. Kelley, Marine Corps Commandant, received a copy of the memorandum and wrote on the routing sheet: "And the cross came crashing down! Victory for the forces of evil." [3] (Exh. 19.)

On January 16, 1986, the Camp Commander forwarded a memorandum to the Commanding General stating his intention to remove the cross. Soon thereafter, the

Commanding General ordered the cross removed. On May 2, 1986, the Hawaii congressional delegation, governor of Hawaii, and mayor of Honolulu were notified that the cross would be removed; they received advance word of the decision because of intense public pressure to retain the cross. On May 6, 1986, a news release was issued stating that the cross would be removed.

The Camp Commander set a date in June, 1986, for the removal, and in the interim ordered that the cross be lit only from dusk to midnight. However, a "tremendous outcry of public opinion, mostly in favor of keeping the cross, followed this decision" (Exh. 4), prompting the Camp Commander to suspend the removal until mid-July while the issue was debated at higher headquarters. As Commandant Kelley recalled, "emotions were running high." Kelley Deposition (Dep.) at 49–50. The Marine Corps received 3,200 written communications in favor of the cross, and one against.

Also in June, 1986, a group called Friends of The Cross, Inc., filed suit in United States District Court for the District of Hawaii concerning the constitutionality of the cross and whether it met the requirements for entry on the National Register of Historic Places.

On June 20, 1986, Krulak, in retirement, sent a letter to the Secretary of the Navy "setting the record straight" about the origin of the cross in 1986. Exh. B to Defendants' Opposition to Plaintiffs' Motion for Summary Judgment. Defendants have adopted the version of events set forth by Krulak, who was Commanding General from April, 1964, until June, 1968. The letter stated in part: "I had erected a memorial cross at Camp H.M. Smith to honor the men of my command who had given their lives in Vietnam. My purpose was to memorialize the sacrifice of all, as I made clear in dedicating the structure." Those who say the cross was erected as a "narrow secular symbol" are "wrong. They distort history," Krulak said.

---

[3]. At his deposition, Kelley testified that "forces of evil" was probably a reference to "the lawyers in the chain of command." Kelley Deposition at 92. "I always have a friendly jousting match with lawyers," Kelley explained. "That was probably who I was referring to." *Id.* at 93.

Krulak subsequently expanded on his views in a declaration attached to Defendants' Motion to Dismiss or for Summary Judgment. Krulak, whose command was headquartered at Camp Smith, stated that his order to build the cross had nothing to do with Easter or with religion at all. During his tenure as Commanding General, American forces were being committed in ever-increasing numbers to Vietnam, where Krulak often traveled. As casualties rose, he felt the sacrifices of the Marines and sailors were not fully appreciated by the American public.

"During late 1965, on a date I cannot specifically recall, I stated to my staff that some memorial to those members of the Fleet Marine Force, Pacific who had died in Vietnam should be erected at Camp Smith. I proposed no concrete ideas as to its form or location, other than that the memorial must be something recognizable as a symbolic monument to personal sacrifice, that it be placed in a prominent location, and that it be an enduring monument worthy of its purpose." Krulak Declaration (Decl.) ¶ 13.

Subsequently, the Camp Commander informed Krulak of a recommendation to erect a memorial in the form of a Latin cross on Bordelon Field overlooking the Honolulu area. Krulak said he was not given a number of options, but a single recommendation. "Since the plan effectuated my stated desire for a visible, recognizable, serious, and symbolic memorial, I approved it. The form chosen was a symbolic indicator of seriousness, but it was not chosen for the furtherance of any religious purpose, or the advancement of one religion over another. It was a recognizable, secular symbol of sacrifice, pure and simple." Id. ¶ 15.

Krulak said he is certain the chaplain did not have a leading role in the memorial. He also is certain that the dedication of the memorial was not part of any religious service or holiday. "I cannot recall the memorial ever being used as a religious symbol, or in support of religious services or activities, for Easter or otherwise, dur-

ing the time I commanded FMFPac [Fleet Marine Force, Pacific]." Id. ¶ 19.

Also submitted by defendants to rebut the March 22, 1979, news release of the Base Public Affairs Office is the declaration of Father Keating, dated July 6, 1987, stating that he was not even assigned to Camp Smith in 1966 when the cross was erected. He was assistant chaplain from July 21, 1961, to August 31, 1963, and stated that he has no memory of an electrician named Tony Clark, interviewed in the 1979 news release. Keating stated emphatically that when his assignment at Camp Smith ended no cross was permanently erected on Bordelon Field. The priest concluded: "I certainly do not oppose the presence of the Latin cross at Camp Smith. I wish I could take credit for its erection, but I can not do so, as I had no part in it." Keating Decl. ¶ 17.

On the basis of Krulak's June 20, 1986, letter to the Secretary of the Navy and unspecified additional research by the Marine Corps Judge Advocate General, Commandant Kelley on July 2, 1986, ordered that the cross remain standing as a memorial to servicemen missing in action or unaccounted for in Southeast Asia. The Commandant said the decision was based on "additional historical research into the origin and purpose of the cross" and he hoped it would serve as "a non-sectarian symbol of our national resolve to obtain a full accounting of American servicemen still missing or unaccounted for in Southeast Asia." Exh. 2 to Defendants' Motion to Dismiss or for Summary Judgment.

Kelley testified that he considered the Navy Judge Advocate General's opinion to have been overtaken by new factual information that had come to light. He did not refer the new information to the Navy's chief lawyer to see how it might affect the legal opinion. He explained why:

[T]here comes a point in time when I am paid to make decisions. Lawyers are paid to give me opinions. We obviously had within that a very complex issue and I made my decision based on what I believed to be the intent of the individu-

8

als who put up that cross at the time and that was as an ecumenical memorial.

Now, there is no sense in getting ourselves flagellated anymore with lawyers. We had gone far enough and now is the time for decision by a decision maker and that is what I got paid for.

Kelley Dep. at 115–16.

As a result of the Commandant's decision, Friends of the Cross withdrew its suit, but on July 31, 1986, 15 plaintiffs of various faiths, apparently represented by the American Civil Liberties Union, filed suit in U.S. District Court in Hawaii. *Aitken v. United States*, No. 86–0533 (D.Haw. filed July 31, 1986). On defendants' motion to dismiss for lack of standing, the District Court dismissed 14 plaintiffs, leaving only one plaintiff, Merle Fischlowitz, who demonstrated palpable damage sufficient to confer standing. *Aitken v. United States*, No. 86–0533, slip op. at 5–9 (D.Hawaii Jan. 16, 1987) (Fong, C.J.).

Fischlowitz, president of Congregation Sof Ma'arav, a conservative Jewish congregation in Honolulu, stated that he altered his travel routes and avoided certain areas to avoid seeing the cross, which he said made him feel like an "alien." Chief Judge Fong found "the curtailment of Fischlowitz's right to use certain public areas in vicinity of the cross constitutes sufficient injury to meet the Article III standing requirements." *Id.* at 8.

After Chief Judge Fong's decision, Fischlowitz was interviewed on television and was the subject of extensive media coverage in Hawaii. Plaintiffs's counsel in this action claim that Fischlowitz began to receive hostile, nasty, and threatening communications. As a result, Fischlowitz discontinued his suit and it was officially dismissed on December 16, 1987. A Marine Corps memo stated that by late August, 1987, "approximately 3,200 residents have voiced strong opinions in writing that the cross be retained. One letter recommending it be removed has been received." Exh. 4 ¶ 1.o, to Plaintiffs' Motion for Summary Judgment.

As the controversy brewed, the Jewish War Veterans of the United States of America met for its annual convention in Honolulu September 2–9, 1986. A number of JWV members complained about the cross, and the organization's National Commander, Harvey Friedman, protested to Navy officials and vowed not to have a convention in Hawaii until the cross was removed. Said Friedman: "I was astounded when I learned of the location of this religious symbol, as I have never experienced such a circumstance in all of my visits to military facilities and bases throughout this country and abroad." Affirmation of Harvey Friedman attached to Plaintiffs' Motion for Summary Judgment. When Fischlowitz abandoned his suit, the Jewish War Veterans filed this action in United States District Court for the District of Columbia on June 9, 1987.

As the foregoing makes clear, the factual disputes between the parties center on the *origin* of the cross, with plaintiffs maintaining it was built for Easter services and defendants maintaining it was built as a memorial to Marines killed in Vietnam. The differences cannot be resolved on this record, but they are not material.

*Venue*

■ This case was reassigned to this Court on December 3, 1987. Before that time, Judge Pratt ruled that venue was proper in this district. *Jewish War Veterans of the United States of America v. United States*, 695 F.Supp. 1 (D.D.C.1987). He relied on 28 U.S.C. § 1391(e)(4), which provides in pertinent part as follows:

(e) A civil action in which a defendant is an officer or employee of the United States or any agency thereof acting in his official capacity or under color of legal authority, or any agency of the United States, or the United States, may, except as otherwise provided by law, be brought in any judicial district in which ... (4) the plaintiff resides if no real property is involved in the action.

28 U.S.C. § 1391(e)(4) (1982).

Judge Pratt stated:

The crux of defendants' challenge to venue of this case in the District of Columbia turns not on whether plaintiff organization is a resident of the District, which it undoubtedly is, but rather on whether "real property is involved in the action" so as to preclude plaintiffs from invoking section 1391(e)(4).

Slip op. at 2 (footnote omitted). Judge Pratt found real property was not involved in the action. *Id.* at 4.

Defendants now argue that discovery has revealed the Jewish War Veterans of the United States of America to be a New York corporation, and that "[f]or purposes of § 1391(e)(4) a corporate plaintiff resides only in the district where it is incorporated." 15 C. Wright, A. Miller & E. Cooper, *Federal Practice & Procedure* § 3811, at 158–59 (2d ed. 1986) (footnote omitted).

Plaintiffs respond that while it is true the JWV was incorporated in New York under the Membership Corporation Law in 1897 and 1924, its state incorporation was superseded by a federal charter conferred by Congress on August 21, 1984. *See* Pub. L. 98–391, § 11, 98 Stat. 1360 (1984). Indeed, the JWV is a "private corporation[ ] established under Federal law" listed at 36 U.S.C. § 1101(62) (Supp.1985); *see also* 36 U.S.C. § 2701–2715 (Supp.1985). In their pleadings, defendants ignore this federal charter and the fact that "a corporation chartered by Act of Congress is not regarded as a citizen of any state, at least where its activity is not localized in a particular state." 13B C. Wright, A. Miller & E. Cooper, *Federal Practice & Procedure* § 3571, at 179 (2d ed. 1984) (footnote omitted).

If a federal corporation has a district of federal incorporation, it surely is the District of Columbia, the seat of the federal government. The District of Columbia also is the JWV's principal place of business, as it is headquartered at 1811 R Street, N.W., Washington, D.C. Thus, the District of Columbia is both the JWV's place of incorporation and principal place of business. The Court joins Judge Pratt in considering the JWV a resident of the District of Columbia. Thus, venue is proper in this District.

### Standing

Defendants challenge the standing of both plaintiffs to bring this action. Plaintiff Maxwell Feuerman is an 11–year resident of the Hawaiian island of Maui, a member of the Jewish War Veterans, and a retired Sergeant Major in the United States Army. His home is some 50 miles from the island of Oahu, which he visits about four times a year to use the Hickham Air Force Base and Oahu Naval Base facilities. *See* Plaintiff Maxwell Feuerman's Response to Interrogatory No. 37. Feuerman alleges as follows in the complaint:

The Plaintiff has the right to use the clubs and facilities of Camp Smith, as a veteran attaining the rank of Sergeant Major. He has the privilege of using the clubs and facilities of all military installations, but has declined to use the facilities of Camp Smith until such time as the subject religious symbol is removed.

On the occasions of Plaintiff's visits to Oahu for shopping and for other purposes, he seeks to and alters his travel route so as to avoid areas where the cross is visible, such as Pearl Ridge Shopping Center, Pearl Harbor and Aloha Stadium.

Complaint ¶¶ 27–28.

Plaintiff Jewish War Veterans of the United States of America was founded in 1896 and was recently federally chartered as a patriotic organization. Among its purposes are upholding the reputation and integrity of Jewish service personnel, combatting bigotry and discrimination in the military, and honoring those of the Jewish faith who died in service of their country. 36 U.S.C. § 2703 (Supp.1985).

The "case or controversy" requirement of Article III of the Constitution requires that the plaintiff " 'show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant' and that the injury 'fairly can be traced to the challenged action' and 'is likely to be redressed by a favorable decision.' " *Valley Forge Chris-*

**10**

*tian College v. Americans United for Separation of Church & State*, 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982) (citations omitted). To the constitutional minima of injury in fact, causation, and redressability, the courts have added a nonconstitutional, "prudential" element: that the plaintiff be within the zone of interests the statutory or constitutional provision was intended to protect. *See Association of Data Processing Service Organizations v. Camp*, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970).

■ We need not be long detained by the standing inquiry, because Feuerman clearly has standing to bring this action as a citizen alleging injury through the curtailment of his use of a public resource. *See United States v. SCRAP*, 412 U.S. 669, 688–89, 93 S.Ct. 2405, 2416–17, 37 L.Ed.2d 254 (1973). While being deeply offended by something does not by itself confer standing, *Valley Forge*, 454 U.S. at 485–87, 102 S.Ct. at 765–66, the doctrine of noneconomic standing developed in *SCRAP* has been applied in a host of Establishment Clause cases, with the same result: courts have found standing. *See American Civil Liberties Union v. City of St. Charles*, 794 F.2d 265, 268–69 (7th Cir.) (altering behavior by detouring from accustomed route to avoid seeing cross sufficient to confer standing; if such minor injury did not confer standing to sue, there would be no judicial remedy against establishments of religion that do not depend on public funds), *cert. denied*, 479 U.S. 961, 107 S.Ct. 458, 93 L.Ed.2d 403 (1986); *Hawley v. City of Cleveland*, 773 F.2d 736, 739–40 (6th Cir.1985) (unwillingness to use airport concourse containing chapel sufficient to confer standing because plaintiffs would be forced "to assume special burdens" to avoid "unwelcome religious exercises") (quoting *Valley Forge*, 454 U.S. at 486–87 n. 22, 102 S.Ct. at 766 n. 22), *cert. denied*, 475 U.S. 1047, 106 S.Ct. 1266, 89 L.Ed.2d 575 (1986); *American Civil Liberties Union v. Rabun County Chamber of Commerce*, 698 F.2d 1098, 1102–09 (11th Cir. 1983) (unwillingness to camp in state park because of presence of cross sufficient to provide "personal stake in the controversy"

required for standing); *Aitken v. United States*, No. 86–0533, slip op. at 5–8 (D.Hawaii Jan. 16, 1987) (plaintiff who "avoids going into that area unless absolutely necessary, because he feels like an alien when he is in the area" has standing because "the curtailment of [the] right to use certain public areas in vicinity of the cross constitutes sufficient injury to meet the Article III standing requirements").

This curtailment in the use of a public resource is precisely the injury alleged by Feuerman. It is not surprising, therefore, that defendants are reduced to arguing that the cases have been "erroneously decided."

A D.C. Circuit case, *Allen v. Hickel*, 424 F.2d 944 (D.C.Cir.1970), also is relevant, though it predates *Valley Forge* and the parties naturally disagree about how much of it survives. The case was cited approvingly in *Hawley*, 773 F.2d at 740, and *Rabun County*, 698 F.2d at 1105, however. In *Allen*, plaintiffs challenged the placement of a nativity scene in the Ellipse, the national park across from the White House. The Government suggested that if plaintiffs did not want to look at the creche they could walk elsewhere. Said the D.C. Circuit: "Plaintiffs were entitled, as members of the public, to enjoy park land and its devotion to permissible public use; a government action cannot infringe that right or require them to give it up without access to the court to complain that the action is unconstitutional." 424 F.2d at 947.

In light of this authority, the Court concludes that Feuerman has standing as a citizen to bring this action. Plaintiffs' other theories of standing also appear well grounded but need be examined only briefly here. First, Feuerman claims standing to sue as a taxpayer under *Flast v. Cohen*, 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968). Taxpayer standing was not alleged in the complaint, but discovery revealed that the cross was rebuilt after a 1983 fire at a cost of $13,000 in public funds and is lit and maintained with public funds. This is a classic case of taxpayer standing to challenge a congressional exercise of the

taxing and spending power in violation of the Establishment Clause.

■ Additionally, JWV claims standing as a representative of its members under *Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977), and as an organization alleging "a concrete and demonstrable injury to the organization's activities," *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379, 102 S.Ct. 1114, 1124, 71 L.Ed.2d 214 (1982). The requirements of both representative and organizational standing appear satisfied, and defendants' challenge to the standing of the plaintiffs must be rejected.

### *Establishment Clause*

The Bill of Rights begins: "Congress shall make no law respecting an establishment of religion ..." U.S. Const. amend. I.

The Establishment Clause is not an easy area of the law, *e.g., Committee for Public Education & Religious Liberty v. Nyquist*, 413 U.S. 756, 760, 93 S.Ct. 2955, 2958–59, 37 L.Ed.2d 948 (1973) ("cases arising under these [Religion] Clauses have presented some of the most perplexing questions to come before this Court"). A number of religious references are found in our statutes, customs, and case law, and have not been found to offend the Establishment Clause. *See Lynch v. Donnelly*, 465 U.S. 668, 675–77, 104 S.Ct. 1355, 1360–61, 79 L.Ed.2d 604 (1984) (discussing instances of "Government's acknowledgement of our religious heritage and governmental sponsorship of graphic manifestations of that heritage"). For example, our national motto, "In God We Trust," 36 U.S.C. § 186 (1982), has been approved by the courts, *see Aronow v. United States*, 432 F.2d 242 (9th Cir.1970), as has the motto's use on our currency, *see O'Hair v. Blumenthal*, 462 F.Supp. 19 (W.D.Tex.

1978), *aff'd*, 588 F.2d 1144 (5th Cir.), *cert. denied*, 442 U.S. 242, 99 S.Ct. 2862, 61 L.Ed.2d 298 (1979); both Thanksgiving and Christmas have been proclaimed National Holidays in religious terms; our Pledge of Allegiance to the American Flag contains the language "One nation under God"; and the Supreme Court has upheld the use of public funds to pay legislative chaplains, *Marsh v. Chambers*, 463 U.S. 783, 103 S.Ct. 3330, 77 L.Ed.2d 1019 (1983).

While it is difficult to speak in this area with absolute certainty, it is significant that defendants are unable to cite a single federal case where a cross such as the one at issue here has survived Establishment Clause scrutiny. Although three state courts have upheld crosses against Establishment Clause attack, *see infra* n. 6, the Supreme Court has denied certiorari in each case, perhaps signaling its reluctance to wade further into a quagmire of case law in this delicate and often awkward area.

Although the Supreme Court has emphasized its "unwillingness to be confined to any single test or criterion in this sensitive area," *Lynch v. Donnelly*, 465 U.S. at 679, 104 S.Ct. at 1362, the test articulated in *Lemon v. Kurtzman*, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), has emerged as the seminal aid to courts in separating the secular from the sectarian. To survive Establishment Clause scrutiny, the challenged governmental action or practice must satisfy three conditions:

> First, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion; finally, the statute must not foster "an excessive government entanglement with religion."

*Id.* at 612–13, 91 S.Ct. at 2111 (citations omitted).[4]

---

**4.** The Supreme Court has applied the *Lemon* framework in all but one establishment clause case. The exception was *Marsh v. Chambers*, 463 U.S. 783, 103 S.Ct. 3330, 77 L.Ed.2d 1019 (1983), upholding legislative chaplains because of the long history of the practice. The Court returned to the *Lemon* test in cases decided after *Marsh. See Wallace v. Jaffree*, 472 U.S. 38, 55, 105 S.Ct. 2479, 2488–89, 86 L.Ed.2d 29 (1985); *Lynch v. Donnelly*, 465 U.S. 668, 679, 104 S.Ct. 1355, 1362, 79 L.Ed.2d 604 (1984). In one case, *Larson v. Valente*, 456 U.S. 228, 252–55, 102 S.Ct. 1673, 1687–89, 72 L.Ed.2d 33 (1982), the court stated the *Lemon* test need not

### a) Secular Purpose

■ The first inquiry is whether the cross has a secular purpose. Although the reason for erecting the cross in the first place is in dispute, there is no dispute about the avowed purpose of the cross now, which in the words of the Marine Corps Commandant is to serve as "a nonsectarian symbol of our national resolve to obtain a full accounting of American servicemen still missing or unaccounted for in Southeast Asia."

Thus, defendants have articulated a secular purpose for the cross. The Supreme Court "is normally deferential to a [government's] articulation of a secular purpose," *Edwards v. Aguillard,* — U.S. —, 107 S.Ct. 2573, 2579, 96 L.Ed.2d 510 (1987), and is reluctant to attribute unconstitutional motive when a plausible secular purpose can be discerned.[5] The Supreme Court has never required an *exclusively* secular purpose. The cross at issue satisfies the secular purpose element of the *Lemon* test.

### b) Secular Effect

■ While the purpose is to be examined subjectively, existence of a non-secular effect is to be judged by an objective standard, "which looks only to the reaction of the average receiver of government communication or average observer of the government action." *Friedman v. Board of County Commissioners,* 781 F.2d 777, 781 (10th Cir.1985) (en banc), *cert. denied,* 476 U.S. 1169, 106 S.Ct. 2890, 90 L.Ed.2d 978 (1986).

Justice O'Connor's concurring opinion in the creche case, *Lynch v. Donnelly,* 465 U.S. 668, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984), is instructive:

> The purpose prong of the *Lemon* test asks whether government's actual purpose is to endorse or disapprove of religion. The effect prong asks whether, irrespective of government's actual purpose, the practice under review in fact conveys a message of endorsement or disapproval. An affirmative answer to either question should render the challenged practice invalid.

465 U.S. at 690, 104 S.Ct. at 1368 (O'Connor, J., concurring).

The requirement that the government action have a "primary secular effect" has been stated another way: any non-secular effect must be remote, indirect, and incidental. *Lynch v. Donnelly,* 465 U.S. at 683, 104 S.Ct. at 1364; *Committee for Public Education & Religious Liberty v. Nyquist,* 413 U.S. at 771, 93 S.Ct. at 2964–65.

Against this standard, the Court must determine the effect of the cross on Bordelon Field on an "objective observer." *Wallace v. Jaffree,* 472 U.S. 38, 76, 105 S.Ct. 2479, 2500, 86 L.Ed.2d 29 (O'Connor, J., concurring in judgment); *id.* at 83, 105 S.Ct. at 2503–04. If it is likely to be perceived as an endorsement of Christianity, or religion in general, then it encroaches on the Establishment Clause.

Running through the decisions of all the federal courts [6] addressing the issue is a

---

be reached where laws discriminate among different religions, but reviewed the *Lemon* factors anyway.

5. While the Supreme Court usually will find a secular purpose and then move on to consideration of the remaining two Establishment Clause criteria, the purpose test has proven decisive in four cases. *Edwards v. Aguillard,* — U.S. —, 107 S.Ct. 2573, 96 L.Ed.2d 510 (1987) (invalidating state law mandating equal treatment for evolution and "creation science" in public schools; avowed secular purpose a sham); *Wallace v. Jaffree,* 472 U.S. 38, 105 S.Ct. 2479, 86 L.Ed.2d 29 (1985) (invalidating state law mandating period of silence in public schools); *Stone v. Graham,* 449 U.S. 39, 101 S.Ct. 192, 66 L.Ed.2d 199 (1980) (per curiam) (invalidating

statute requiring posting of Ten Commandments in classrooms); *Epperson v. Arkansas,* 393 U.S. 97, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968) (invalidating statute preventing teaching of evolution).

6. Three state courts have found crosses not to conflict with the Establishment Clause. In 1976, the Oregon Supreme Court sitting en banc upheld a "Veterans War Memorial Cross" erected by the American Legion in a municipal park. *Eugene Sand & Gravel, Inc. v. City of Eugene,* 276 Or. 1007, 558 P.2d 338 (1976), *cert. denied,* 434 U.S. 876, 98 S.Ct. 226, 54 L.Ed.2d 155 (1977). "[W]e believe it to be clear that the display of a large cross in a public park as a veteran's war memorial under such circumstances does not violate constitutional require-

single thread: that the Latin cross (a cross whose base stem is longer than the other three arms) is a readily identifiable symbol of Christianity. *See American Civil Liberties v. City of St. Charles,* 794 F.2d 265, 271 (7th Cir.) (Posner, J.) ("When prominently displayed on a public building that is clearly marked as and known to be such, the cross dramatically conveys a message of governmental support for Christianity, whatever the intentions of those responsible for the display may be. Such a display is not only religious but sectarian."), *cert. denied,* 479 U.S. 961, 107 S.Ct. 458, 93 L.Ed.2d 403 (1986); *Friedman v. Board of County Commissioners,* 781 F.2d 777, 782 (10th Cir.1985) (en banc) (Logan, J.) (county government's prominent use of seal bearing Latin cross and motto "With This We Conquer" in Spanish "conveys a strong impression to the average observer that Christianity is being endorsed"), *cert. denied,* 476 U.S. 1169, 106 S.Ct. 2890, 90 L.Ed.2d 978 (1986); *American Civil Liberties Union v. Rabun County Chamber of Commerce,* 698 F.2d 1098, 1103 (11th Cir. 1983) (per curiam) ("Substantial evidence supports the district court's finding that the latin cross is a universally recognized symbol of Christianity."); *Gilfillan v. City of Philadelphia,* 637 F.2d 924 (3d Cir.1980) (Rosenn, J.) (city construction of stage and 36-foot high cross for papal visit violates Establishment Clause), *cert. denied,* 451 U.S. 987, 101 S.Ct. 2322, 68 L.Ed.2d 845 (1981); *Libin v. Town of Greenwich,* 625 F.Supp. 393, 399 (D.Conn.1985) (Burns, J.) (cross has meaning only as symbol of

Christianity; invitation to viewer to make religious connection "can be construed as a message endorsing the religious beliefs that allow the connection to be made"); *Greater Houston Chapter of American Civil Liberties Union v. Eckels,* 589 F.Supp. 222, 234 (S.D.Tex.1984) (Bue, J.) ("use of religious means to achieve secular goals where nonreligious means will suffice is forbidden.... [B]ecause the county can effectively recognize its war dead without resort to the use of these religious symbols, it must do so.") (footnote and citations omitted), *appeal dismissed,* 755 F.2d 426 (5th Cir.), *cert. denied,* 474 U.S. 980, 106 S.Ct. 383, 88 L.Ed.2d 336 (1985).

Two of these cases are close factually to this case. In *Rabun County,* the State of Georgia allowed the Chamber of Commerce to erect an illuminated Latin cross on an 85-foot structure in Black Rock Mountain State Park. After objections were received, the state suggested that the Chamber designate the cross as a memorial for deceased persons, although this was never done. The Chamber argued in litigation that the cross served the secular purpose of promoting tourism. The 11th Circuit found the cross violated both the secular purpose and secular effect tests of *Lemon.* 698 F.2d at 1101–11. In *Eckels,* Harris County, Texas, built and maintained three Latin crosses and a Star of David in Bear Creek Park as an area of mediation. After litigation commenced, a second purpose was avowed: the crosses and Star of David were to be part of a planned war memorial to honor the nation's war dead. The dis-

---

ments despite the fact that it is admittedly a religious symbol," the court said. 276 Or. at 1020, 558 P.2d at 346. The court found that "a monument with a cross is an appropriate symbol of sacrifice by men who gave their lives for their country in time of war." 276 Or. at 1022, 558 P.2d at 347. The Oklahoma Supreme Court upheld a 50-foot cross in the midst of a fairgrounds. *Meyer v. Oklahoma City,* 496 P.2d 789 (Okla.), *cert. denied,* 409 U.S. 980, 93 S.Ct. 314, 34 L.Ed.2d 244 (1972). The court said the commercial setting and atmosphere "obscures whatever suggestions may emanate from its silent form, stultify its symbolism and vitiate any use, benefit, or support for any sect, church, denomination, system of religion or sectarian institution as such." 496 P.2d at 793. In *Paul v. Dade County,* 202 So.2d 833 (Fla.Dist.Ct.App.1967),

*cert. denied,* 390 U.S. 1041, 88 S.Ct. 1636, 20 L.Ed.2d 304 (1968), the record did "not indicate that this temporary string of lights forming a cross was used to support, aid, maintain or establish any religion or religious edifices." 202 So.2d at 835. The court appeared to view this as an evidentiary failing.

Federal courts that have acknowledged the state cases have either distinguished them, *e.g., City of St. Charles,* 794 F.2d at 274, or disagreed with them, *e.g., Rabun County,* 698 F.2d at 1110 n. 23 (state cases "questionable" as well as distinguishable); *Greater Houston Chapter of American Civil Liberties Union v. Eckels,* 589 F.Supp. 222, 238–39 (S.D.Tex.1984) (Oregon case "both non-binding and erroneous"), *appeal dismissed,* 755 F.2d 426 (5th Cir.), *cert. denied,* 474 U.S. 980, 106 S.Ct. 383, 88 L.Ed.2d 336 (1985).

trict court found that the symbols violated both the purpose and effects tests of *Lemon.* 589 F.Supp. at 234–35.

While federal courts for the most part have stopped short of holding the use of religious tools where secular ones will do unconstitutional per se, it seems fair to say that the needless use of means that are inherently religious makes a message of endorsement likely if not unavoidable. The 65–foot lighted cross on Bordelon Field at Camp Smith may fairly be considered to convey a message of governmental endorsement of Christianity. The use of a cross as a memorial to fallen or missing servicemen is a use of what to some is a religious symbol where a nonreligious one likely would have done as well. The Court is constrained to find that cross cannot satisfy the secular effect prong of the *Lemon* test because it conveys a message of endorsement of Christianity.

### c) Excessive entanglement

■ The final element of the *Lemon* test focuses on government entanglement with religion. Entanglement can take many forms, but only one entanglement doctrine is relevant to this case: a statute or government act is more likely to be found unconstitutional if it generates religion-based political division.

"[W]hile the prospect of such divisiveness may not alone warrant the invalidation of state laws that otherwise survive the careful scrutiny required by the decisions of this Court, it is certainly a 'warning signal' not to be ignored." *Committee for Public Education & Religious Liberty v. Nyquist,* 413 U.S. 756, 797–98, 93 S.Ct. 2955, 2977–78, 37 L.Ed.2d 948 (1973) (quoting *Lemon,* 403 U.S. at 625, 91 S.Ct. at 2117 (1971) (Douglas, J., concurring)).

The record demonstrates that the cross at Camp Smith has caused some polarization of the community. Commandant Kelley reported that emotions were running high. Suits were filed on both sides of the issue in Hawaii. The Marine Corps reported receiving 3,200 written communications favoring the cross, and one against.

### d) Departures from the Lemon test

■ The Supreme Court has departed from the *Lemon* framework in *Marsh v. Chambers,* 463 U.S. 783, 103 S.Ct. 3330, 77 L.Ed.2d 1019 (1983), and *Larson v. Valente,* 456 U.S. 228, 102 S.Ct. 1673, 72 L.Ed.2d 33 (1982). *Marsh* upheld the Nebraska Legislature's employment of a Presbyterian minister as the official legislative chaplain to give an opening prayer at each state legislative session. The Court relied primarily on history and tradition as well as the Framers' intent as bases for its holding. The cross at issue in this case does not meet the threshold requirements for this "historical" test under the Establishment Clause; the government does not even suggest that the use of the cross in this manner is "deeply embedded in the history and tradition of this country", *Marsh,* 463 U.S. at 786, 103 S.Ct. at 3333, or interwoven into "the fabric of society." *Id.* at 792, 103 S.Ct. at 3336. The defendants make no Free Exercise argument for the cross; instead, they argue that the cross is devoid of religious meaning in this context, or that any religious meaning is *de minimis.*

*Larson v. Valente* involved a Minnesota statute which denied an exemption from certain registration and reporting requirements to religious organizations receiving more than fifty percent of their charitable contributions from nonmembers. The Supreme Court held that a statute such as that one which explicitly discriminates among religions "must be invalidated unless it is justified by a compelling governmental interest and unless it is closely fitted to further that interest." 456 U.S. at 247, 102 S.Ct. at 1685 (citations omitted). In light of the Court's analysis under *Lemon,* however, it is unnecessary to reach plaintiffs' claim that the cross at Camp Smith discriminates on its face among religions and should be subjected to strict scrutiny.

### Conclusion

Summary judgment is appropriate if no genuine issues of material fact remain for trial. Fed.R.Civ.P. 56. While the record before the Court is not devoid of disputes, none is material to the ruling that the cross

violates the Establishment Clause. The principal symbol of Christianity, this nation's dominant religion, simply is too laden with religious meaning to be appropriate for a government memorial assertedly free of any religious message. While the Court is unwilling to say that a Latin cross is *ipso facto* unconstitutional, it is constrained to find its use inappropriate in this case.

The Court shall enter summary judgment for plaintiffs and a permanent injunction. However, in view of the fact that the cross has stood for 22 years, the Court shall briefly stay its order that the cross be removed. The stay, which shall expire 60 days from the entry of this Memorandum Opinion and Order, is designed solely to give defendants an opportunity to seek a further stay from an appellate court pending appeal.