**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

STEVE TRUNK,
                                    *Plaintiff,*

              and

JEWISH WAR VETERANS OF THE
UNITED STATES OF AMERICA, INC.;
RICHARD A. SMITH; MINA SAGHEB;
JUDITH M. COPELAND,
                    *Plaintiffs-Appellants,*

              v.

CITY OF SAN DIEGO; UNITED STATES
OF AMERICA; ROBERT M. GATES,
Secretary of Defense,
                    *Defendants-Appellees.*

No. 08-56415

D.C. Nos.
3:06-cv-01597-
LAB-WMC
3:06-cv-01728-
LAB-WMC

175

STEVE TRUNK, PHILIP K. PAULSON,
          *Plaintiffs-Appellants,*

              and

RICHARD A. SMITH; MINA SAGHEB;
JUDITH M. COPELAND; JEWISH WAR
VETERANS OF THE UNITED STATES OF
AMERICA, INC.,

                      *Plaintiffs,*

              v.

CITY OF SAN DIEGO; UNITED STATES
OF AMERICA; MOUNT SOLEDAD
MEMORIAL ASSOCIATION, Real
parties in interest; ROBERT M.
GATES, Secretary of Defense, in
his official capacity,
          *Defendants-Appellees,*

No. 08-56436

D.C. Nos.
3:06-cv-01597-
LAB-WMC
3:06-cv-01728-
LAB-WMC

OPINION

Appeal from the United States District Court
for the Southern District of California
Larry A. Burns, District Judge, Presiding

Argued December 9, 2009
Submitted December 30, 2010
Pasadena, California

Filed January 4, 2011

Before: Harry Pregerson, M. Margaret McKeown, and
Richard A. Paez, Circuit Judges.

Opinion by Judge McKeown

---

## COUNSEL

John David Blair-Loy, ACLU Foundation of San Diego and Imperial Counties, San Diego, California; Matthew T. Jones [argued], Adam Raviv, Wilmer Hale LLP, Washington, DC; Daniel Mach, American Civil Liberties Union, Washington, DC, for the plaintiffs-appellants.

George Frederick Schaefer, City Attorney's Office, San Diego, California, for defendant-appellee City of San Diego.

Kathryn E. Kovacs [argued], U.S. Department of Justice, Washington, DC; Thomas C. Stahl, U.S. Attorney's Office, Washington, DC, for defendants-appellees United States of America and Robert M. Gates.

---

## OPINION

McKEOWN, Circuit Judge:

The forty-three foot cross ("Cross") and veterans' memorial ("Memorial") atop Mount Soledad in La Jolla, California,

have generated controversy for more than twenty years. During this time, the citizens of San Diego (where La Jolla is located), the San Diego City Council, the United States Congress, and, on multiple occasions, the state and federal courts have considered its fate. Yet no resolution has emerged. Indeed, we believe that no broadly applauded resolution is possible because this case represents the difficult and intractable intersection of religion, patriotism, and the Constitution. Hard decisions can make good law, but they are not painless for good people and their concerns.

Much lore surrounds the Cross and its history. But the record is our guide and, indeed, except for how they characterize the evidence, the parties essentially agree about the history. A cross was first erected on Mount Soledad in 1913. That cross was replaced in the 1920s and then blew down in 1952. The present Cross was dedicated in 1954 "as a reminder of God's promise to man of everlasting life and of those persons who gave their lives for our freedom . . . ." The primary objective in erecting a Cross on the site was to construct "a permanent handsome cast concrete cross," but also "to create a park worthy of this magnificent view, and worthy to be a setting for the symbol of Christianity." For most of its history, the Cross served as a site for annual Easter services. Only after the legal controversy began in the late 1980s was a plaque added designating the site as a war memorial, along with substantial physical revisions honoring veterans. It was not until the late 1990s that veterans' organizations began holding regular memorial services at the site.[1]

More fundamentally, this war memorial—with its imposing Cross—stands as an outlier among war memorials, even those incorporating crosses. Contrary to any popular notion, war memorials in the United States have not traditionally included or centered on the cross and, according to the parties' evi-

---

[1]We include as Appendix A photographs from the record that depict the Cross up close and from a distance.

dence, there is no comparable memorial on public land in which the cross holds such a pivotal and imposing stature, dwarfing by every measure the secular plaques and other symbols commemorating veterans.

The Latin cross, long acknowledged as a preeminent Christian symbol, remains, as a towering forty-three foot structure, the dominant feature of the Memorial. As we concluded the last time we considered this matter, albeit under the California Constitution, "[this] sectarian war memorial carries an inherently religious message and creates an appearance of honoring only those servicemen of that particular religion." *Ellis v. City of La Mesa*, 990 F.2d 1518, 1527 (9th Cir. 1993). But we revisit the question in this case because the Cross, originally on city land, was transferred to the federal government through a 2006 congressional initiative. This suit requires us to consider whether the Memorial, with the Cross as its defining feature, violates the First Amendment to the federal Constitution.

Simply because there is a cross or a religious symbol on public land does not mean that there is a constitutional violation. Following the Supreme Court's directive, we must consider the purpose of the legislation transferring the Cross, as well as the primary effect of the Memorial as reflected in context, history, use, physical setting, and other background. Although we conclude that Congress did not harbor a sectarian purpose in establishing the Memorial in 2006, the resolution of the primary effect of the Memorial is more nuanced and is driven by the factual record. We do not look to the sound bites proffered by both sides but instead to the extensive factual background provided in the hundreds of pages of historical documents, declarations, expert testimony, and public records. Here, a fact-intensive evaluation drives the legal judgment.

The Supreme Court's framework for evaluating monuments on public lands and for resolving Establishment Clause cases

under the First Amendment leads us to conclude that the district court erred in declaring the Memorial to be primarily non-sectarian, and granting summary judgment in favor of the government and the Memorial's supporters. We are not faced with a decision about what to do with a historical, longstanding veterans memorial that happens to include a cross. Nor does this case implicate military cemeteries in the United States that include headstones with crosses and other religious symbols particular to the deceased. Instead we consider a site with a free-standing cross originally erected in 1913 that was replaced with an even larger cross in 1954, a site that did not have any physical indication that it was a memorial nor take on the patina of a veterans memorial until the 1990s, in response to the litigation. We do not discount that the Cross is a prominent landmark in San Diego. But a few scattered memorial services before the 1990s do not establish a historical war memorial landmark such as those found in Arlington Cemetery, Gettysburg, and the Vietnam Veterans Memorial in Washington, D.C. Resurrection of this Cross as a war memorial does not transform it into a secular monument.

We acknowledge the good intentions and heartfelt emotions on all sides of this dispute, and recognize the sincere anguish that will be felt regardless of whether we affirm or reverse the district court. We also acknowledge the historical role of religion in our civil society. In no way is this decision meant to undermine the importance of honoring our veterans. Indeed, there are countless ways that we can and should honor them, but without the imprimatur of state-endorsed religion. At the same time, in adopting the First Amendment, the Founders were prescient in recognizing that, without eschewing religion, neither can the government be seen as favoring one religion over another. The balance is subtle but fundamental to our freedom of religion.

## BACKGROUND

Mount Soledad is an 822-foot hill in the La Jolla community of San Diego, California, between Interstate 5 and the

Pacific Ocean. There has been a Latin cross atop Mount Sole-dad since 1913. After the first cross was destroyed by vandals in 1923, a new cross was erected. That cross stood until it blew down in 1952. The current Cross was erected in 1954 and was dedicated as a memorial to American service members and a tribute to God's "promise of everlasting life." The Cross is quite large—twenty-nine feet high and twelve feet across—stands atop a fourteen foot high base, and weighs approximately twenty-four tons. As a result, the Cross is visible from miles away and towers over the thousands of drivers who travel daily on Interstate 5 below. The Mount Soledad Memorial Association ("the Association"), the civic organization that erected the Cross, has largely paid for the Cross's maintenance, though some public funds have been expended as well. *Paulson v. City of San Diego*, 294 F.3d 1124, 1125 (9th Cir. 2002) (en banc).

Although the Cross stood alone for most of its history, it has, since the late 1990s, become the centerpiece of a more extensive war memorial. This Memorial now features six concentric walls around the base of the Cross and approximately 2,100 black stone plaques honoring individual veterans, platoons, and groups of soldiers. Brick paving stones also honor veterans; twenty-three bollards, or posts, honor community and veterans' organizations; and an American flag flies from a large flagpole. Until the events leading up to this suit, the Memorial stood on land belonging to the City of San Diego ("the City").

The Memorial has been the subject of contentious litigation for the last two decades. In 1989, two Vietnam veterans sued the City, seeking to enjoin it from allowing the Cross to remain on city land. *Murphy v. Bilbray*, 782 F. Supp. 1420, 1424 (S.D. Cal. 1991). Ultimately, the district court enjoined the display of the Cross—which, at the time, stood alone—as a violation of the No Preference Clause of the California Constitution.[2] *Id.* at 1438. We affirmed the injunction in *Ellis*, 990

---

[2]The No Preference Clause provides that "[f]ree exercise and enjoyment of religion without discrimination or preference are guaranteed." Cal. Const. art. I, § 4.

F.2d at 1527-28, holding that the Cross, to the extent that it could be characterized as a memorial, was "[a] sectarian war memorial carr[ying] an inherently religious message and creat[ing] an appearance of honoring only . . . servicemen of [a] particular religion." *Id.* at 1527. We did not reach the issue of whether the Cross violated the federal Constitution's Establishment Clause.

In response to the injunction, the City submitted a ballot initiative known as Proposition F to authorize the sale of a twenty-two square foot parcel of land sitting directly beneath the Cross to the Association. Seventy-six percent of those voting approved the measure. In October 1994, the City sold the land to the Association without soliciting offers or proposals from any other prospective buyers. *See Paulson*, 294 F.3d at 1126. The district court invalidated the sale, however, holding that the City's failure to consider other prospective buyers created the appearance that the City preferred the Christian religion and that the primary purpose of the sale was to preserve the Cross. *Murphy v. Bilbray*, No. 90-134 GT, 1997 WL 754604, *10-11 (S.D. Cal. Sept. 18, 1997). The City responded by soliciting bids for a second land sale, ultimately selling the land to the Association in September 1998. The Association then proceeded to modify the property to incorporate elements directly honoring veterans.

After further litigation, our court, sitting en banc, held that the 1998 sale violated California's No Preference Clause because it was structured to give "a direct, immediate, and substantial financial advantage to bidders who had the sectarian purpose of preserving the cross." *Paulson*, 294 F.3d at 1133. Following that decision, the parties then reached a settlement that would move the Cross to a neighboring church. In July 2004, the City Council passed a resolution to compel the City to accept the settlement if voters did not approve Proposition K, which would have required a third sale of the land to the highest bidder. City voters rejected Proposition K.

Soon after the failure of Proposition K, two local members of Congress, then-Representative Randy Cunningham and Representative Duncan Hunter, inserted a rider into the 2005 omnibus budget bill designating the Mount Soledad property as a national veterans' memorial and authorizing the federal government to accept its donation. Consolidated Appropriations Act, Pub. L. No. 108-447, § 116, 118 Stat. 2809, 3346-47 (codified at 16 U.S.C. § 431 note). The Thomas More Law Center,[3] whose West Coast Director, Charles LiMandri, was a signatory of the ballot argument in favor of Proposition K, lobbied local members of Congress to intervene. President George W. Bush signed the omnibus bill into law on December 8, 2004.

The City Council declined to donate the Mount Soledad property to the federal government.[4] A new organization formed by LiMandri and others launched a referendum petition to "save the Mount Soledad cross" via transfer to the federal government. The City Council rescinded its decision and submitted the donation question to the voters as Proposition A. Proposition A garnered seventy-six percent of the vote, but a state trial court enjoined its implementation. *See Paulson v. Abdelnour*, 51 Cal. Rptr. 3d 575, 585 (Cal. Ct. App. 2006).

While the appeal of the state court injunction was pending, the federal district court issued an order directing the City to remove the Cross within ninety days or pay a daily fine of $5,000. *Paulson v. City of San Diego*, No. 89-0820 GT, 2006 WL 3656149, at *2 (S.D. Cal. May 3, 2006). The City appealed and sought a stay pending appeal, which our court denied. Justice Kennedy then granted the City's stay application. *See San Diegans for the Mt. Soledad Nat'l War Mem'l v. Paulson*, 548 U.S. 1301, 1302 (2006).

---

[3]The Thomas More Law Center is a "not-for-profit public interest law firm dedicated to the defense and promotion of the religious freedom of Christians, time-honored family values, and the sanctity of human life."

[4]The then-City Attorney formally opined that the donation would violate the federal and state constitutions.

In June 2006, Representatives Hunter, Issa, and Bilbray introduced H.R. 5683 ("the Act"), which proposed to seize the Memorial by eminent domain.[5] The House approved the bill by a vote of 349 to 74. 152 Cong. Rec. H5434 (daily ed. July 19, 2006). The Senate approved the measure by unanimous consent.

The Act authorized the land transfer "in order to preserve a historically significant war memorial, designated the Mt. Soledad Veterans Memorial in San Diego, California, as a national memorial honoring veterans of the United States Armed Forces . . . ." *Id.* at H5422, § 2(a). In support of the acquisition, Congress found that the Memorial has stood as a tribute to U.S. veterans for over fifty-two years, *id.* § 1(1), and "now serves as a memorial to American veterans of all wars," *id.* § 1(2). The Act also declared that "[t]he United States has a long history and tradition of memorializing members of the Armed Forces who die in battle with a cross or other religious emblem of their faith, and a memorial cross is fully integrated as the centerpiece of the multi-faceted Mt. Soledad Veterans Memorial that is replete with secular symbols." *Id.* § 1(3). The Act required the Department of Defense, which has since assigned the duties to the Navy, to manage the property and enter a memorandum of understanding with the Association for the Memorial's "continued maintenance." *Id.* § 2(c).[6]

The federal government took possession of the Memorial in August 2006. Pub. L. No. 109-272, § 2(a), 120 Stat. 770

---

[5]LiMandri stated publicly that he helped draft the legislation, a fact that the government contests. The Thomas More Law Center also lobbied Senator Jeff Sessions, the sponsor of the Senate version of the bill, for his support.

[6]This court dismissed the City's appeal of the district court's order as moot in light of the Act. *Paulson v. City of San Diego*, 475 F.3d 1047, 1048 (9th Cir. 2007). The California Court of Appeal also reversed the trial court's injunction of Proposition A, holding that the City's effort to donate the memorial to the United States did not violate the state or federal Constitutions. *Abdelnour*, 51 Cal. Rptr. 3d at 589-603.

(2006). That same month, Steve Trunk and Philip Paulson (now deceased) filed suit against the City and the United States in district court, alleging violations of the U.S. and California Constitutions.[7] Jewish War Veterans, which describes itself as "the oldest active national veterans' service in America" and as a group that "engages in extensive advocacy in support of religious liberty," also filed suit against the Secretary of Defense, complaining that the display of the Cross violated the Establishment Clause. The district court consolidated the two cases.[8]

In 2008, the district court denied Jewish War Veterans's motion for summary judgment and granted the government's motion for summary judgment. Applying the Supreme Court's frameworks set forth in both *Lemon v. Kurtzman*, 403 U.S. 602 (1971), and *Van Orden v. Perry*, 545 U.S. 677 (2005), the district court held that Congress had acted with a secular purpose in acquiring the Memorial and that the Memorial did not have the effect of advancing religion. This appeal followed.

## ANALYSIS

## I.   THE *LEMON* AND *VAN ORDEN* FRAMEWORKS

We review de novo the district court's decision on cross motions for summary judgment. *See Donohue v. Quick Collect, Inc.*, 592 F.3d 1027, 1030 (9th Cir. 2010). "We must determine, viewing the evidence in the light most favorable to . . . the nonmoving party, whether there are any genuine

---

[7]Trunk later filed an amended complaint seeking, among other things, a declaration that the Act was void *ab initio*. The district court held that Trunk lacked standing to challenge the Act, dismissed that claim for lack of jurisdiction, and dismissed the City as a party.

[8]We refer to Trunk, Paulson, and Jewish War Veterans collectively as "Jewish War Veterans," and to the United States and the Secretary of Defense collectively as "the government."

issues of material fact and whether the district court correctly applied the [relevant] substantive law." *Olsen v. Idaho State Bd. of Med.*, 363 F.3d 916, 922 (9th Cir. 2004). We have jurisdiction to review the district court's denial of the Jewish War Veterans's summary judgment motion because the district court considered cross motions for summary judgment and granted the government's motion. The district court's grant of summary judgment was a final decision, giving us jurisdiction. *See Abend v. MCA, Inc.*, 863 F.2d 1465, 1482 n.20 (9th Cir. 1988).

**[1]** The First Amendment provides that "Congress shall make no law respecting an establishment of religion." U.S. Const. amend. I. As the Supreme Court has explained, the "touchstone" of Establishment Clause jurisprudence is the requirement of " 'governmental neutrality between religion and religion, and between religion and nonreligion.' " *McCreary County v. ACLU*, 545 U.S. 844, 860 (2005) (quoting *Epperson v. Arkansas*, 393 U.S. 97, 104 (1968)). However, because "neutrality" is a general principle, it "cannot possibly lay every issue to rest, or tell us what issues on the margins are substantial enough for constitutional significance." *McCreary*, 545 U.S. at 876; *see also Van Orden*, 545 U.S. at 699 (Breyer, J., concurring in the judgment) ("[W]here the Establishment Clause is at issue, tests designed to measure 'neutrality' alone are insufficient.").

In particular, we do not apply an absolute rule of neutrality because doing so would evince a hostility toward religion that the Establishment Clause forbids. Thus the Court in *McCreary* approvingly cited Justice Harlan's observation that " 'neutrality' . . . is not so narrow a channel that the slightest deviation from an absolutely straight course leads to condemnation" by the First Amendment. *McCreary*, 545 U.S. at 876 (quoting *Sherbert v. Verner*, 374 U.S. 398, 422 (1963) (Harlan, J., dissenting)); *see also School Dist. of Abington Twp. v. Schempp*, 374 U.S. 203, 306 (1963) (Goldberg, J., concurring) (cautioning that an "untutored devotion to . . . neutrality" can

lead to "a brooding and pervasive devotion to the secular and a passive, or even active, hostility to the religious"). We must undertake a more nuanced analysis.

The Supreme Court has articulated two related constructs that guide our analysis: the test set forth in *Lemon*, which—through various twists and turns—has long governed Establishment Clause claims, and the analysis for monuments and religious displays more recently articulated in *Van Orden*. The *Lemon* test asks whether the action or policy at issue (1) has a secular purpose, (2) has the principal effect of advancing religion, or (3) causes excessive entanglement with religion. *Lemon*, 403 U.S. at 612-13. In recent years, the Supreme Court essentially has collapsed these last two prongs to ask "whether the challenged governmental practice has the effect of endorsing religion." *Access Fund v. U.S. Dep't of Agric.*, 499 F.3d 1036, 1043 (9th Cir. 2007) (reviewing cases). Although *Lemon* has been strongly criticized, the Supreme Court has never overruled it, and in fact applied the *Lemon* test to a Ten Commandments display in an opinion issued the same day as *Van Orden*. *McCreary*, 545 U.S. at 859-64; *see also Card v. City of Everett*, 520 F.3d 1009, 1016 (9th Cir. 2008) (discussing the Supreme Court's criticism and use of the *Lemon* test).

In *Van Orden*, the Court declined to apply *Lemon* to a Ten Commandments monument on the grounds of the Texas State Capitol. Addressing whether that monument violated the Establishment Clause, the plurality struggled with reconciling "the strong role played by religion and religious traditions throughout our Nation's history" with the constitutional separation of church and state. *Van Orden*, 545 U.S. at 683. The plurality concluded that the *Lemon* test was "not useful in dealing with the sort of passive monument that Texas ha[d] erected on its Capitol grounds." *Id.* at 686. Instead, its analysis focused on "the nature of the monument and . . . our Nation's history." *Id.* Taking into consideration the role of God and the Ten Commandments in the nation's founding

and history, *id.* at 686-87, 689-90, the monument's passive use, and its "undeniable historical meaning," *id.* at 690, the plurality concluded that the display passed constitutional muster, *id.* at 692.

As we have recognized, Justice Breyer's concurrence provides the controlling opinion in *Van Orden*. *Card*, 520 F.3d at 1017-18 n.10. Justice Breyer envisioned a set of "difficult borderline cases" like the Texas Capitol monument for which there could be "no test-related substitute" *Lemon* or otherwise —"for the exercise of legal judgment." *Van Orden*, 545 U.S. at 700 (Breyer, J., concurring in the judgment). Rather than requiring the application of a test, Justice Breyer concluded, displays like the Texas monument demand a fact-intensive assessment of whether they are faithful to the underlying purposes of the Establishment Clause. *See id.* He explained that this flexible assessment entails a range of factors, including the monument's purpose, the perception of that purpose by viewers, the extent to which the monument's physical setting suggests the sacred, and the monument's history. *See id.* at 701-03. Notably, this inquiry does not dispense with the *Lemon* factors, but rather retains them as "useful guideposts." *Id.* at 700. Justice Breyer's analysis thus incorporated many of the same factors that figure in a *Lemon* analysis—in particular, the predominant purpose of the monument and its effect on viewers—while refusing to be bound to any lock-step formula. *See id.* at 701-04.

*Van Orden* expressly establishes an "exception" to the *Lemon* test in certain borderline cases regarding the "constitutionality of some longstanding plainly religious displays that convey a historical or secular message in a non-religious context." *Card*, 520 F.3d at 1016. Unfortunately, Justice Breyer did not explain in detail how to determine whether a case was borderline and thus less appropriate for the typical *Lemon* analysis. *Card*—the only Ninth Circuit case to date to apply the *Van Orden* exception—considered a monument that was almost identical to the monument in *Van Orden* and therefore

provides little additional guidance. *See Card*, 520 F.3d at 1018 ("We cannot say how narrow or broad the 'exception' may ultimately be . . . . However, we can say that the exception at least includes the display of the Ten Commandments at issue here.").

**[2]** Ultimately, we need not resolve the issue of whether *Lemon* or *Van Orden* controls our analysis of the Memorial. Both *Lemon* and *Van Orden* require us to determine Congress's purpose in acquiring the Memorial and to engage in a factually specific analysis of the Memorial's history and setting. On the detailed record here, which includes extensive evidence relevant to each of the factors in *Van Orden* and to the purpose and effect prongs of *Lemon*, both cases guide us to the same result.

## II.    CONGRESSIONAL PURPOSE IN ACQUIRING THE MEMORIAL

Under both *Lemon* and *Van Orden*, we first inquire as to the purpose of the government action to determine whether it is predominantly secular in nature. *See Van Orden*, 545 U.S. at 701-02; *Lemon*, 403 U.S. at 612. We hold that Congress's acquisition of the Memorial was predominantly secular in its goals.

As an initial matter, Jewish War Veterans argues that, to determine purpose, we need look no further than the Cross itself. In its view, "the government action itself besp[eaks] the purpose" because the Latin cross is the "preeminent symbol" of Christianity. This argument is at bottom one regarding the Memorial's predominant effect, and we consider it more appropriate to address in our discussion of effects below. *See infra* Section III.

The Supreme Court explained in *McCreary* that the purpose inquiry does not call for "any judicial psychoanalysis of a drafter's heart of hearts." *McCreary*, 545 U.S. at 862. Rather, "[t]he eyes that look to purpose belong to an objective

observer, one who takes account of the traditional external signs that show up in the text, legislative history, and implementation of the statute, or comparable official act." *Id.* (internal quotation marks omitted). Although the secular purpose must "be genuine, not a sham," *id.* at 864, when a statute is at issue, we must defer to Congress's stated reasons if a "plausible secular purpose . . . may be discerned from the face of the statute," *Mueller v. Allen*, 463 U.S. 388, 394-95 (1983).

**[3]** The purpose of Congress's acquisition of the Memorial was predominantly secular in nature. The Act sought "to preserve a historically significant war memorial . . . as a national memorial honoring veterans of the United States Armed Forces." Pub. L. No. 109-272, § 2(a). As the district court noted, the statute is "not directed to the cross *per se*, nor does it require the continued presence of the cross as part of the memorial; it simply requires the Mount Soledad *site* be maintained as a veterans' memorial."

The Act's statement of purpose likely ends the inquiry. *See Mueller*, 463 U.S. at 394-95. Nevertheless, the Act is arguably ambiguous to the extent that it seeks "to preserve a *historically significant* war memorial." Pub. L. 109-272 § 2(a) (emphasis added). In *Paulson*, the case invalidating the City's 1998 land sale to the Association, we held that only *the Cross* on Mount Soledad bears historical significance. *Paulson*, 294 F.3d at 1132 n.5 (emphasis added). Under *Paulson*, the Act could be read to aim at preserving the Cross, which would arguably make its purpose predominantly religious.

**[4]** But even assuming that the Act is ambiguous, the legislative history reflects Congress's predominantly secular purpose in acquiring the Memorial.[9] Representative Hunter, for

---

[9]These legislative recitations do not bind us as to our evaluation of the actual history and chronology of the Cross. They are simply instructive as to congressional perspective and purpose. We must evaluate the Cross itself on the basis of the record before us, which includes not only the Act, but also hundreds of pages of documents about the Cross's history and setting and about the use of crosses in war memorials more generally that were not before Congress when it acquired the Memorial.

example, described the Cross as "not only a religious symbol," but also "a venerated landmark beloved by the people of San Diego for over 50 years" and "a fitting memorial to all persons who have served and sacrificed for our Nation as members of the Armed Forces." 152 Cong. Rec. H5423 (daily ed. July 19, 2006); *see also id.* at H5422-02 (stating that Mount Soledad "is without question a world-class memorial, dedicated to all of those, regardless of race, religion[,] or creed, who have served our armed services"). Representative Issa similarly stated that the Memorial "was intended to do what it does for the vast majority of San Diegans and people who come to our fair city. It honors our war veterans for the sacrifice they made." *Id.* at H5424. According to Representative Issa, the acquisition was "consistent with how we as Americans have honored our war dead and those who have given in service to our country" and advanced the "freedom for people to observe their God as they chose fit." *Id.*

Representative Bilbray argued for the Act on the grounds of religious tolerance and the memorial's secular historical significance. He cited the presence of "many religious symbols on public lands" in San Diego County and argued that "this is not about religion; it is about the tolerance of our heritage and the memorials to those who have fought for our heritage across the board." *Id.* at H5425.

**[5]** Finally, although Senator Sessions introduced the Senate bill as intended "to preserve the cross that stands at the center of Mt. Soledad Veterans Memorial . . . that is under attack by the ACLU," he underlined that the Cross was "part of a memorial that has secular monuments also." 152 Cong. Rec. S8364 (daily ed. July 27, 2006). Taken together, the floor statements support the text's demonstration of Congress's predominantly secular purpose in acquiring the Memorial.

Jewish War Veterans's arguments to the contrary do not change our view. In particular, the evidence of the role of

Christian advocacy organizations in the Act's passage is not probative of Congress's objective. Although such advocacy can form part of the context for determining an act's purpose, *see, e.g.*, *Epperson*, 393 U.S. at 107-09 & n.16, we must take into account the often complex, attenuated, and mediated relationship between advocacy and legislation. Although the advocacy by Christian organizations may have been a contributing factor to the Act's drafting and passage, the record does not establish that the sectarian goals of the advocates can be reasonably attributed to Congress as a whole. In the end, "what is relevant is the legislative purpose of the statute, not the possibly religious motives of the legislators who enacted the law." *Mergens*, 496 U.S. at 249 (emphases omitted).[10] In crediting congressional purpose, we underscore, however, that these congressional statements reflect congressional sentiment and are not necessarily reflective of the factual record before us. We turn to the actual record to assess the primary effect of the Memorial.

## III. THE EFFECT OF THE MEMORIAL

[6] The heart of this controversy is the primary effect of the Memorial. The question is, under the effects prong of *Lemon*, whether "it would be objectively reasonable for the

---

[10]It bears noting that we do not adopt the district court's inference of a secular purpose from the overwhelming majority support for the Act and relative absence of debate over its passage. Majority support for a measure indicates simply that—majority support. It does not illuminate whether the measure approved has a secular or religious purpose. *See McCreary*, 545 U.S. at 884 (O'Connor, J., concurring) (noting that "we do not count heads before enforcing the First Amendment").

The district court also cited the heterogeneity of religions in Congress as a basis for inferring secular purpose. We cannot credit this speculation as a foundation for our decision. Resolution does not rest on a popularity contest about the Cross. Importantly, nothing in the record suggests that the legislators voted based on their personal religious beliefs. Congress's religious profile, without more, is an insufficient basis to infer its predominant purpose.

government action to be construed as sending primarily a message of either endorsement or disapproval of religion." *Vernon v. City of Los Angeles*, 27 F.3d 1385, 1398 (9th Cir. 1994). By "endorsement," we are not concerned with all forms of government approval of religion—many of which are anodyne—but rather those acts that send the stigmatic message to nonadherents " 'that they are outsiders, not full members of the political community, and an accompanying message to adherents that they are insiders, favored members . . . .' " *Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 309-10 (2000) (quoting *Lynch v. Donnelly*, 465 U.S. 668, 688 (1984) (O'Connor, J., concurring)).

Although it is often difficult to pinpoint "a community ideal of reasonable behavior" in an area where communities are so often divided in their views, *see Capitol Square Review and Advisory Bd. v. Pinette*, 515 U.S. 753, 780 (1995) (O'Connor, J., concurring in part and concurring in the judgment) (internal quotation marks omitted), we conduct our inquiry from the perspective of an "informed and reasonable" observer who is "familiar with the history of the government practice at issue," *Kreisner v. City of San Diego*, 1 F.3d 775, 784 (9th Cir. 1993).

The analysis required by *Van Orden* is similar. Under *Van Orden*, we are required to exercise our legal judgment to determine whether the Memorial is at odds with the underlying purposes of the First Amendment's Religion Clauses. *See* 545 U.S. at 700 (Breyer, J., concurring in the judgment). Those clauses

> seek to assure the fullest possible scope of religious liberty and tolerance for all. They seek to avoid that divisiveness based upon religion that promotes social conflict . . . . They seek to maintain that separation of church and state that has long been critical to the peaceful dominion that religion exercises in this country . . . .

*Id.* at 698 (internal citations and quotation marks omitted).

In our analysis, we must consider fine-grained, factually specific features of the Memorial, including the meaning or meanings of the Latin cross at the Memorial's center, the Memorial's history, its secularizing elements, its physical setting, and the way the Memorial is used. *See, e.g.*, *id.* at 700-02; *County of Allegheny v. ACLU Greater Pittsburgh Chapter*, 492 U.S. 573, 598-602 (1989). The government contends that these factors demonstrate that the Memorial's primary effect is patriotic and nationalistic, not religious. We disagree. Taking these factors into account and considering the entire context of the Memorial, the Memorial today remains a predominantly religious symbol. The history and absolute dominance of the Cross are not mitigated by the belated efforts to add less significant secular elements to the Memorial.

## A.   THE LATIN CROSS

**[7]** We begin by considering the potential meanings of the Latin cross that serves as the centerpiece and most imposing element of the Mount Soledad Memorial. We have repeatedly recognized that "[t]he Latin cross is the preeminent symbol of Christianity." *Buono v. Norton*, 371 F.3d 543, 544-45 (9th Cir. 2004) (internal quotation marks omitted); *accord Separation of Church & State Comm. v. City of Eugene*, 93 F.3d 617, 620 (9th Cir. 1996) (per curiam) ("*SCSC*"); *Carpenter v. City & County of San Francisco*, 93 F.3d 627, 630 (9th Cir. 1996); *Ellis*, 990 F.2d at 1525, 1527. The other courts of appeals that have considered challenges to Latin crosses have unanimously agreed with our characterization of the cross. *See Robinson v. City of Edmond*, 68 F.3d 1226, 1232 (10th Cir. 1995); *Murray v. City of Austin*, 947 F.2d 147, 149 (5th Cir. 1991); *Harris v. City of Zion*, 927 F.2d 1401, 1403 (7th Cir. 1991); *ACLU v. City of St. Charles*, 794 F.2d 265, 271 (7th Cir. 1986); *see also Gonzales v. North Township*, 4 F.3d 1412, 1418 (7th Cir. 1993) ("[W]e are masters of the obvious, and we know that the crucifix is a Christian symbol."); *Fried-*

*man v. Bd. of County Comm'rs*, 781 F.2d 777, 779 (10th Cir. 1985) (en banc) (recounting testimony concerning the Christian nature of the cross); *ACLU v. Raburn County Chamber of Commerce, Inc.*, 698 F.2d 1098, 1110-11 (11th Cir. 1983) (same); *Jewish War Veterans of the U.S. v. United States*, 695 F. Supp. 3, 12 (D.D.C. 1988) ("Running through the decisions of all the federal courts addressing the issue is a single thread: that the Latin cross . . . is a readily identifiable symbol of Christianity.").

**[8]** The cross is also "exclusively a Christian symbol, and not a symbol of any other religion." *Buono*, 371 F.3d at 545. Thus, "[t]here is no question that the Latin cross is a symbol of Christianity, and that its placement on public land . . . violates the Establishment Clause." *SCSC*, 93 F.3d at 620; *see also County of Allegheny*, 492 U.S. at 661 (Kennedy, J., dissenting) (stating that "the permanent erection of a large Latin cross on the roof of city hall" "would place the government's weight behind an obvious effort to proselytize on behalf of a particular religion"); *American Atheists, Inc. v. Duncan*, 616 F.3d 1145, 1159-60 (10th Cir. 2010) ("[T]here is little doubt that [a state] would violate the Establishment Clause if it allowed a private group to place a permanent unadorned twelve-foot cross on public property without any contextual or historical elements that served to secularize the message conveyed by such a display.").

This principle that the cross represents Christianity is not an absolute one. In certain circumstances, even a quintessentially sectarian symbol can acquire an alternate, non-religious meaning. For example, a red Greek cross on a white background is so closely identified with the American Red Cross that it has largely shed any religious symbolism. *City of St. Charles*, 794 F.2d at 272. Notably the Red Cross cross does not include the Latin cross's iconic horizontal arm that is shorter than the vertical arm. The cross can also have localized secular meanings. Because the name of Las Cruces, New Mexico means "The Crosses," "it is hardly startling that [the

city] would be represented by a seal containing crosses."
*Weinbaum v. City of Las Cruces*, 541 F.3d 1017, 1035 (10th
Cir. 2008). In Las Cruces, the cross possesses a local "sym-
bolism [that] is not religious" but civic. *See id.*; *see also Mur-
ray*, 947 F.2d at 155 (upholding the use of a part of Stephen
F. Austin's coat of arms, including a Latin cross, in the insig-
nia of the City of Austin).[11] The cross can even be forced to
serve non-religious ends by a small group: As Justice Thomas
has recognized, "[t]he erection of . . . a cross [by the Ku Klux
Klan] is" "not a Christian [act]" but rather "a political act" of
"intimidation and harassment." *Pinette*, 515 U.S. at 771
(Thomas, J., concurring). Nonetheless, the Latin cross
remains an iconic Christian symbol.

## B.   CROSSES AS WAR MEMORIALS

**[9]** The relevant question in this case is whether, as the dis-
trict court concluded, the Latin cross has a "broadly-
understood ancillary meaning as a symbol of military service,
sacrifice, and death." Our prior cases counsel caution in
ascribing this meaning to the cross. We have, in fact, previ-
ously held that the Mount Soledad Cross contravened the No
Preference Clause of the California state constitution even
while recognizing that the Cross is "dedicated to veterans of
World Wars I & II." *Ellis*, 990 F.2d at 1527. We have simi-
larly rejected the view that a cross erected on public land in
Oregon conveyed a secular message simply because it was
identified as a war memorial. *See SCSC*, 93 F.3d at 619; *id.*
at 625-26 (O'Scannlain, J., concurring); *see also Ellis*, 990
F.2d at 1525 ("We find unpersuasive the fact that the cross
was built and dedicated as a memorial to a private individual

---

[11]The argument that a cross has a historic connection cannot, of course,
be treated as "an argument which [can] always 'trump' the Establishment
Clause[ ] because of the undeniable significance of religion and religious
symbols in the history of many [American] communities." *Robinson*, 68
F.3d at 1232; *see also Zion*, 927 F.2d at 1414-15 (holding that even a city
with "a unique history" "may not honor its history by retaining [a] bla-
tantly sectarian seal, emblem, and logo").

. . . . This alone cannot transform the cross into a secular memorial.").

[10] The reasoning behind our prior decisions is straight-forward. "A sectarian war memorial carries an inherently religious message and creates an appearance of honoring only those servicemen of that particular religion." *Ellis*, 990 F.2d at 1527. Thus, the use of exclusively Christian symbolism in a memorial would, as Judge O'Scannlain has put it, "lead observers to believe that the City has chosen to honor only Christian veterans." *SCSC*, 93 F.3d at 626 (O'Scannlain, J., concurring). And insofar as the cross is "not a *generic* symbol of death" but rather "a *Christian* symbol of death that signifies or memorializes the death of a *Christian*," *American Atheists*, 616 F.3d at 1161, a reasonable observer would view a memorial cross as sectarian in nature.

Nothing in the record suggests that our reasoning in *SCSC* and *Ellis* was mistaken or that the Latin cross possesses an ancillary meaning as a secular war memorial. The Jewish War Veterans have provided two expert declarations from G. Kurt Piehler, a professor of history and Director of the Study for War and Society at the University of Tennessee. Those declarations provide extensive evidence that the cross is not commonly used as a symbol to commemorate veterans and fallen soldiers in the United States.[12] Piehler's history is not rebutted

---

[12]The district court "discounted" Piehler's statements on the grounds that the "declaration circumscribe[d] its focus on an individual element of the memorial" and "fail[ed] to fully consider other well-recognized meanings of the Latin cross." In "discounting" the expert's opinion, the district court was not gatekeeping but weighing the evidence, indeed inserting evidence, which is improper on summary judgment. *See Sluimer v. Verity, Inc.*, 606 F.3d 584, 587 (9th Cir. 2010). The district court's reasons for minimizing the weight of the expert's conclusions were also erroneous and not a fair reading of the evidence. The district court simply assumed that the Latin cross has an ancillary meaning as a war memorial and leveraged that assumption to reject Piehler's declarations and other contrary evidence in the record. In doing so, the district court failed to consider the

by the government's experts, and the record supports Pie-
hler's conclusion that the vast majority of war memorials in
the United States do not include crosses. We accordingly
recount Piehler's history at some length.

Piehler's declarations address both the individual commem-
oration of soldiers in national cemeteries and the large num-
ber of monuments that stand in tribute to groups of soldiers
or to the veterans of particular wars. Piehler recounts that the
first national cemeteries were established after the Civil War
and were deliberately devoid of religious symbols. Even
today, the only religious symbol that can be found in Civil
War cemeteries is the Southern cross of honor, which has
been allowed since 1930 on headstones built in memory of
Confederate soldiers. The graves of soldiers who died before
World War I and are buried in national cemeteries are simi-
larly marked "only [by] the soldier's name, his unit, and his
date of death."

Military cemeteries have not, of course, remained entirely
free of religious symbolism. Most famously, American sol-
diers who fell in battle during World War I and World War
II are movingly memorialized with "thousands of small
crosses in foreign fields" in Europe and the Pacific. *Salazar
v. Buono*, 130 S. Ct. 1803, 1820 (2010) (plurality op.). But
while the image of row upon row of small white crosses
amongst the poppies remains an exceedingly powerful one,
not all soldiers who are memorialized at those foreign battle-
fields are honored with crosses. Jewish soldiers are instead

---

evidence in the light most favorable to Jewish War Veterans before grant-
ing summary judgment to the government. *See id.* More specifically, the
district court erroneously branded Piehler's declarations as conclusory,
ignoring the detailed listings and historical analysis provided in the record.
At the same time, the district court accepted without comment the state-
ments of the government's expert, Professor Linenthal, who offered a
number of wholly conclusory statements without historical reference or
supporting facts.

commemorated with Stars of David. *American Atheists*, 616 F.3d at 1161. The cross was a marker of an individual grave, not a universal monument to the war dead. And tellingly, the universal symbol emanating from those foreign wars is the poppy, not the cross.

Significantly, the cross never became a default headstone in military cemeteries in the United States. A visitor to Arlington or another national cemetery does not encounter a multitude of crosses but rather the "flat upright stone monument[s]" that mark the graves of individual soldiers. Symbols of faith are carved into the headstones, but those symbols are not restricted to crosses and now include everything from a Bahai nine-pointed star to a Wiccan pentacle. *See id.* The cross, in other words, has never been used to honor all American soldiers in any military cemetery, and it has never been used as a default gravestone in any national cemetery in the United States.[13] Whatever memory some may have of rows of crosses as the predominant symbol for honoring veterans is not reflected in this record.

Crosses have also been incorporated only rarely into monuments commemorating groups of soldiers. Piehler's declarations reveal that few war memorials were built in the antebellum United States, and those that were constructed most frequently took the form of an obelisk. Many more monuments—at least 3,500—were built to commemorate the

---

[13]The article cited by the district court in support of its view that the cross is a generic war memorial reinforces this point. The article discusses a memorial display set up by anti-war protestors on the beach at Oceanside, California. The memorial does include a large number of crosses—each dedicated to an American soldier who died in Iraq—but those crosses represent dead *Christian* soldiers. As the article cited by the district court notes, the display also includes "a handful of Buddhist, Hindu, Muslim and Jewish symbols" presumably representing fallen soldiers of those faiths. Bruce V. Bigelow, *Beach exhibit calls attention to fallen*, *San Diego Union-Tribune* Nov. 11, 2007, *available at* http://www.signonsandiego.com/uniontrib/20071111/news_1mc11crosses.html.

Civil War. Only 114 of these 3,500 monuments include some kind of cross, however, and the cross is generally "subordinated to symbols that emphasize American nationalism and sacrifice of the fallen." The memorial to Major General John Sedgwick at West Point, for example, includes a cross, but that cross is set off by "an eagle perched on a shield" and is overshadowed by a large statue of Sedgwick.

In the late nineteenth and early twentieth centuries, the number of crosses used in memorials increased slightly. Crosses and other religious symbols nevertheless were "seldom . . . dominant" and "usually [remained] subordinated to a commemoration of American nationalism." For instance, the first chapel dedicated to the Civil War opened in Arlington National Cemetery in 1920—but the chapel is a small basement room annexed to a much larger outdoor auditorium.

This trend of emphasizing the secular nature of commemoration continued throughout the twentieth century. Monuments erected in honor of World War I soldiers remained predominantly secular, with statues of doughboys providing perhaps the most common theme. Some of these monuments were later updated to commemorate World War II veterans as well. And many memorials constructed to remember those who fought in both world wars are, in fact, not stone monuments but rather secular "living memorials"—parks, hospitals, and other facilities that were built both to honor veterans and for daily use. The City of San Diego itself built in 1950, and still operates, a War Memorial Auditorium in Balboa Park that consists of "3,150 square feet of wood dance floor and a stage[ ] plus two smaller classrooms." No cross or religious symbol is part of the memorial. The use of such living memorials has lately declined in favor of traditional stone monuments, but newer monuments remain secular in their imagery —as illustrated by the most recent additions to the National Mall in Washington, D.C., including the memorials to the Korean War and World War II.

On the basis of this detailed history, Piehler concludes that "the overwhelming majority of war memorials in the United States . . . avoid using religious symbols and inscriptions." In particular, he states that "[t]here are few precedents for use of the Latin Cross in war memorials on public land," and "when war memorials use religious imagery, [that imagery] generally [is] subordinated to symbols and inscriptions that commemorate American nationhood."

None of Piehler's history is contested by the government. The government instead cites to a small number of crosses that are incorporated into war memorials, but these examples do not create a material issue of fact concerning the meaning of the Latin cross. Nor do those few examples fairly lead to the conclusion that the cross has become a secularized representation of war memory. Overwhelming evidence shows that the cross remains a Christian symbol, not a military symbol.

Several of the crosses the government references are parts of much larger secular or multi-faith complexes. The most significant examples are located in Arlington National Cemetery—the Canadian Cross of Sacrifice, the Argonne Cross, and a cross commemorating the Mexican Civil War. None of these crosses is a prominent or predominant feature of the cemetery, and the overall image and history of this military burial ground are not founded on religion. All three crosses stand among, if not immediately next to, the countless headstones of soldiers buried in Arlington and alongside a large number of other monuments that do not incorporate religious imagery.[14] Headstone after headstone, punctuated by the eternal flame at President Kennedy's grave site, represent the imagery of Arlington. Much the same can be said for the Irish Brigade Monument and the monument to the 142nd Pennsylvania Infantry. Those monuments, which stand at Gettysburg National Military Park, are also surrounded by other statues

---

[14]The same is true of the French Cross at Cypress Hill National Cemetery, which, as its name suggests, commemorates French soldiers.

and monuments—including over 100 other monuments honoring Pennsylvania troops alone—that do not feature the cross.[15] The Arlington and Gettysburg crosses are, in other words, non-dominant features of a much larger landscape providing a "context of history" and memory that overwhelms the sectarian nature of the crosses themselves. *Van Orden*, 545 U.S. at 702 (Breyer, J., concurring in the judgment). These crosses are not comparable to the Mount Soledad Cross, which dominates the small park of which it is the centerpiece and can be seen from miles away.

We do not question or address the constitutionality of the crosses at Arlington Cemetery and Gettysburg. While we conclude on this record that the Latin cross is a sectarian symbol, many monuments that include sectarian symbols do not have the primary effect of advancing religion. *See* Part III.C.1, *infra*. Our holding that the presence of the Mount Soledad Cross on federal land contravenes the Establishment Clause is driven by the history, setting, and appearance of that Cross—features that, as we discuss below, sharply distinguish the Cross from other war memorials containing religious symbols.

Aside from the Arlington and Gettysburg memorials, only two other crosses that serve as war memorials in the United States are mentioned in the record. One, the Mojave Cross, now stands on private land. *See Buono*, 130 S. Ct. at 1811, 1815-21 (rejecting a challenge to the "statute that would transfer [that] cross and the land on which it stands to a private party"). The other cross referenced, the Memorial Peace Cross in Bladensburg, Maryland, may or may not stand on public land. The record does not inform us.

Prior decisions inform us of just a handful of other standalone crosses that have been dedicated as war memorials on

[15]The Irish Brigade Monument cross is a Celtic cross and may celebrate the Irish origin of the soldiers instead of their religion.

public land. These prior decisions do little to establish that the cross is a prevalent symbol to commemorate veterans. In two of the four cases we found in which crosses were used as war memorials, the crosses in question were only designated as war memorials after the start of litigation. *See, e.g.*, *SCSC*, 93 F.3d at 618 (relating that Latin cross designated as a war memorial following rulings by the state courts that the cross violated the federal and state constitutions); *Greater Houston Chapter of the ACLU v. Eckels*, 589 F. Supp. 222, 225, 234-35 (S.D. Tex. 1984) (noting that three crosses and a Star of David were rededicated as a war memorial after litigation commenced). In a third case, the plaintiffs similarly alleged that the cross in question was rededicated as a memorial after a complaint from a Jewish naval officer that the cross violated the doctrine of separation of church and state, while the defendants claimed the cross had always been a memorial. *Jewish War Veterans*, 695 F. Supp. at 5. We could locate only one case in which it was undisputed that the cross in question was dedicated as a war memorial from the outset. *Gonzales*, 4 F.3d at 1414, 1421-23 (holding unconstitutional a crucifix in a public park "to honor the heroic deeds of servicemen who gave their life in battle"). In light of the multitude of war memorials in the United States, however, these few examples do not cast doubt on our conclusion and that of the Jewish War Veterans's expert, that the cross has not been a universal, or even a common, feature of war memorials.[16]

---

[16]The parties and *amici* mention several other memorials, none of which raises a material question of fact as to whether the cross possesses an ancillary meaning as a war memorial. Three of these monuments—the Cape Henry Memorial Cross, the statue of Father Junipero Serra in the U.S. Capitol, and a statue at Cabrillo National Monument in San Diego— are not war memorials but tributes to the memory and achievements of particular (Christian) Europeans. Another, the Navy memorial at Fort Rosecrans, does not include a cross. Two others stand on property owned by Christian churches. Finally, the government and *amici* name several other war memorials without offering a description of the memorials' physical characteristics. These passing references provide no basis for any comparison with the Cross on Mount Soledad.

**[11]** In sum, the uncontested facts are that the cross has never been used as a default grave marker for veterans buried in the United States, that very few war memorials include crosses or other religious imagery, and that even those memorials containing crosses tend to subordinate the cross to patriotic or other secular symbols. The record contains not a single clear example of a memorial cross akin to the Mount Soledad Cross. On another record, we might reach a different result, but on the basis of the evidence here, we can only conclude that the Latin cross does not possess an ancillary meaning as a secular or non-sectarian war memorial. There is simply "no evidence . . . that the cross has been widely embraced by"— or even applied to—"non-Christians as a secular symbol of death" or of sacrifice in military service. *American Atheists*, 616 F.3d at 1162.[17] It is thus unsurprising that, as the government's expert admits, "[o]ver the course of time, Mount Soledad and its cross became a generic Christian site." The Latin cross can, as in Flanders fields, serve as a powerful symbol

---

[17] We recognize that one of the government's experts, Edward T. Linenthal, submitted a declaration opining that "[c]rosses at battle sites, or memorials to veterans' service are not sectarian religious symbols" but instead "signify enduring national themes of" American civil religion, such as "redemptive blood sacrifice and the virtue of selfless service." Linenthal's declaration discusses American civil religion, its "[r]itual expression[s]," and its symbols in some detail and specifically lists the symbols used to celebrate Memorial Day, including "the American flag, the meticulous decorating of graves . . . [and] parades of civic groups, high school bands, and veterans of the American Legion and Veterans of Foreign Wars." But Linenthal attempts to incorporate crosses into American civil religion only by stating that war memorials are part of the civil religion and then listing a few of the monuments discussed above. In light of the uncontested history submitted by Jewish War Veterans, the few memorials cited by Linenthal provide less than a scintilla of evidence to support his conclusion that the Latin cross serves as a non-sectarian war memorial. Linenthal's conclusory declaration is insufficient to create an issue of material fact on this issue. *See, e.g.*, *Nelson v. Pima Cmty. Coll.*, 83 F.3d 1075, 1081 (9th Cir. 1996) ("The mere existence of a scintilla of evidence is not enough to create a genuine issue of material fact in order to preclude summary judgment.") (internal quotation marks omitted).

of death and memorialization, but it remains a sectarian, Christian symbol.[18]

---

[18]In *Buono*, Justice Kennedy, writing for the plurality, suggested that a Latin cross may be a generic symbol of memorialization, noting that "one Latin cross in the desert evokes far more than religion. It evokes thousands of small crosses in foreign fields marking the graves of Americans who fell in battles, battles whose tragedies are compounded if the fallen are forgotten." 130 S. Ct. at 1820.

We note that the Court in *Buono* was not addressing the merits of the Establishment Clause challenge to the cross at issue in that case. Nonetheless, we have thoroughly considered Justice Kennedy's opinion. As we have discussed, the record before us does not establish that Latin crosses have a well-established secular meaning as universal symbols of memorialization and remembrance. On the record in this appeal, the "thousands of small crosses" in foreign battlefields serve as individual memorials to the lives of the Christian soldiers whose graves they mark, not as generic symbols of death and sacrifice. Even assuming that a Latin cross can convey a more secular message, however, Justice Kennedy himself states that the meaning of the cross cannot be "divorced from its background and context." *Id.* As we discuss below, the background and context of the Mount Soledad Cross projects a strongly sectarian message that overwhelms any undocumented association with foreign battlefields or other secular meanings that the Cross might possess.

Further, we cannot overlook the fact that the Cross is *forty-three feet tall*. It physically dominates the Memorial, towering over the secular symbols placed beneath it, and is so large and placed in such a prominent location that it can be seen from miles away. A forty-three foot cross that was erected in part to celebrate Christianity, and that serves as the overwhelming centerpiece to a memorial is categorically different from the small crosses used to mark the graves of individual Christian soldiers. The size and prominence of the Cross evokes a message of aggrandizement and universalization of religion, and not the message of individual memorialization and remembrance that is presented by a field of gravestones. *See American Atheists*, 616 F.3d at 1162 ("The massive size of the crosses displayed on Utah's rights-of-way and public property unmistakably conveys a message of endorsement, proselytization, and aggrandizement of religion that is far different from the more humble spirit of small roadside crosses.").

### C.  THE MOUNT SOLEDAD MEMORIAL

Our conclusion that the Latin cross is a Christian religious symbol of remembrance or memorialization does not, of course, end the matter. The cross on Mount Soledad does not stand alone. Instead, it is the overwhelming centerpiece of a memorial that now consists of approximately 2,100 plaques, six concentric stone walls, twenty-three bollards, and an American flag. These other elements are either uniquely secular or contain symbols of varying faiths. These changes are, however, of recent vintage, and we must gauge the overall impact of the Memorial in the context of its history and setting.

### 1.  The Importance of Setting and History

[12] Secular elements, coupled with the history and physical setting of a monument or display, can—but do not always —transform sectarian symbols that otherwise would convey a message of government endorsement of a particular religion. In *County of Allegheny*, for instance, the Supreme Court upheld a holiday display—located outside a public building— consisting of an eighteen foot menorah, a forty-five foot Christmas tree that the Court deemed a typically secular emblem of the holidays, and a sign saluting liberty. *See* 492 U.S. at 616-17. Although Justice O'Connor's controlling opinion considered the menorah to be an entirely sectarian object, she determined that the display as a whole communicated a secular message. In the same way that a museum might convey the message of art appreciation without endorsing a religion even though individual paintings in the museum have religious significance, the holiday display in *Allegheny* conveyed a message of religious pluralism and freedom, even though some elements of the display were sectarian. *Id.* at 635 (O'Connor, J., concurring in part and concurring in the judgment).

By contrast, the Court in *Allegheny* held that a crèche displayed on the Grand Staircase of the county courthouse vio-

lated the Establishment Clause. The crèche is a Christian display, and the crèche in *Allegheny* "st[ood] alone" on the staircase in a "floral frame," which, "like all good frames, serve[d] only to draw one's attention to the message inside the frame." *Id.* at 598-99. The crèche therefore "convey[ed] a message to nonadherents of Christianity that they are not full members of the political community, and a corresponding message to Christians that they are favored members of the political community." *Id.* at 626 (O'Connor, J., concurring in part and concurring in the judgment).

But to complicate things, in the line of Establishment Clause jurisprudence, the display of a crèche on public property does not always convey such a message. The Christmas display sponsored by the City of Pawtucket, Rhode Island, for example, included both a crèche and secular decorations such as "a Santa Claus house, reindeer pulling Santa's sleigh, candy-striped poles, a Christmas tree, carolers, [and] cutout figures" of animals and a clown. *Lynch*, 465 U.S. at 671. Given the presence of these secular elements, "[t]he evident purpose of including the crèche in the larger display was not promotion of the religious content of the crèche but celebration of the public holiday through its traditional symbols." *Id.* at 691 (O'Connor, J., concurring).

Like the crèche, the text of the Ten Commandments conveys an "undeniably . . . religious message." *Van Orden*, 545 U.S. at 701 (Breyer, J., concurring in the judgment). When placed in the midst of numerous other, non-religious monuments, however, a display of the Commandments can also impart a "secular moral message." *Id.* As a result, such a display is, like the crèche among secular objects, permissible— at least when the monument was privately donated and stood without legal controversy for forty years. *See id.* at 701-03.

The question, then, is whether the entirety of the Mount Soledad Memorial, when understood against the background of its particular history and setting, projects a government

endorsement of Christianity. We conclude it does. In so holding, we do not discount the fact that the Cross was dedicated as a war memorial, as well as a tribute to God's promise of "everlasting life," when it was first erected, or that, in more recent years, the Memorial has become a site for secular events honoring veterans. We do not doubt that the present Memorial is intended, at least in part, to honor the sacrifices of our nation's soldiers. This intent, however, is insufficient to render the Memorial constitutional. Rather, we must inquire into the overall effect of the Memorial, taking into consideration its entire context, not simply those elements that suggest a secular message. *See American Atheists*, 616 F.3d at 1159 ("[A] secular purpose is merely one element of the larger factual and historical context that we consider in order to determine whether [the display] would have an impermissible effect on the reasonable observer."). In conducting this inquiry, we learned that the Memorial has a long history of religious use and symbolism that is inextricably intertwined with its commemorative message. This history, combined with the history of La Jolla and the prominence of the Cross in the Memorial, leads us to conclude that a reasonable observer would perceive the Memorial as projecting a message of religious endorsement, not simply secular memorialization.

## 2.   History of the Mount Soledad Memorial and La Jolla

The Supreme Court has instructed that, when assessing the effect of a religious display, we must consider history carefully: "reasonable observers have reasonable memories, and [the Court's] precedents sensibly forbid an observer to 'turn a blind eye to the context in which [the] policy arose.'" *McCreary*, 545 U.S. at 866 (quoting *Santa Fe Indep. Sch. Dist.*, 530 U.S. at 308); *accord Pinette*, 515 U.S. at 780 (O'Connor, J., concurring in part and concurring in the judgment) ("[T]he reasonable observer in the endorsement inquiry must be deemed aware of the history and context of the com-

munity and forum in which the religious display appears."); *Buono*, 371 F.3d at 550. The Memorial's history stretches back more than five decades, and we must consider how the Memorial was used and the message it conveyed throughout this entire period, and not just in the short time that it has stood on federal land. Congress' acquisition of the Cross in 2006 did not erase the first fifty-two years of its life, or even its history dating back to the beginning of the twentieth century. As the district court noted, when Congress acquired the Memorial, it was obligated to "tak[e] history as it [found] it."

**[13]** History would lead the reasonable observer to perceive a religious message in the Memorial. For most of its life, the Memorial has consisted of the Cross alone. The Cross is the third in a line of Latin crosses that has stood on Mount Soledad since 1913. Mount Soledad was chosen as the site for the first cross because it was considered "a fitting place on which to erect an emblem of faith." The earlier crosses were not dedicated as war memorials, but served as the site of intermittent Easter sunrise services. When the Cross was erected in 1954, it was dedicated "as a lasting memorial to the dead of the first and second World Wars and the Korean conflict." There was no physical indication that the Cross was intended as a war memorial, however, until a plaque was added to the site in 1989, after litigation over the Cross had begun.

At the same time, the Cross's religious nature has been widely recognized and promoted since it was first erected. When seeking permission from the La Jolla Town Council to erect the Cross, the Association explained that its objective was to "create a park . . . worthy to be a setting for [this] symbol of Christianity." The Association sent out fundraising letters that called on potential donors to support "this manifestation, this symbol, of our faith." The Association also raised funds for the Cross at Easter services and through the performance of a Christian play, "Paul of Corinth," at a local church.

**[14]** The Cross was dedicated on Easter Sunday in a ceremony that included a Christian religious service. The Cross was dedicated not only to fallen soldiers, but also to Jesus Christ with the hope that it would be "a symbol in this pleasant land of Thy great love and sacrifice for all mankind." The program for the ceremony referred to the Cross as "a gleaming white symbol of Christianity."

After the Cross's dedication in 1954, the Association held Easter services at the Memorial annually until at least 2000, and other religious ceremonies have been held there since. The annual Easter services included readings from the Bible, a Christian prayer and benediction, and songs such as "Jesus Christ is Risen Today" and "All Hail the Power of Jesus' Name." Until the early 1990s, the program for the annual Easter service recounted the Cross's history and described it as "a gleaming white Cross" that serves as a "reminder of God's Promise to man of redemption and everlasting life." During this same time period, the Cross was referred to as the "Easter Cross" on local maps.

**[15]** In contrast to this ample evidence of religious usage, the record of secular events at the Memorial is thin. The Association represented in its 1998 bid for the land sale that it had conducted annual memorial services at the site for forty-six years, but the government's expert historian could point to evidence of only two Veterans day ceremonies—one in 1971 and one in 1973—that occurred prior to 1989. The government provides record evidence of secular events at the Memorial only from 1996 onward—after the litigation began and after the government started attempting to transform the site.

The Cross's importance as a religious symbol has been a rallying cry for many involved in the litigation surrounding the Memorial.[19] LiMandri and the Thomas More Law Center

---

[19]The district court largely discounted this fact, holding that it was "neither logical nor proper" to impute the motivations of the Association and

were integral in devising the plan to designate the land as a national veterans' memorial. They publicly characterized the campaign to save the Cross in religious terms—for example, as a "spiritual battle." LiMandri declared that "Christ won the war on Calvary. These are just kind of mop-up battles . . . ." LiMandri also participated in a fifty-four day prayer movement in front of the Cross that opened with the singing of "Immaculate Mary," and the prayer of twenty mysteries of the rosary.

Other Christian advocacy groups like the American Family Association, the American Center for Law & Justice, and Fidelis launched national petition campaigns for the Cross; an intercessory prayer movement was held by the Christian Defense Counsel outside the White House. Representatives from many of these groups participated in a meeting of the San Diego City Council to consider whether to accept the federal transfer. At the meeting, participants advocated for the transfer by invoking the Cross's importance as a Christian symbol, and denouncing their opponents as "Satanists" or "hate[rs] of Christianity." When the Act passed, the Christian Coalition "commend[ed] the great efforts . . . in saving this historic symbol of Christianity in America." The starkly religious message of the Cross's supporters would not escape the notice of the reasonable observer. *See Van Orden*, 545 U.S.

---

City to the federal government. This reasoning is correct on its own terms, *see Pleasant Grove City v. Summum*, 129 S. Ct. 1125, 1136 (2009) (distinguishing the intent of private donors and the government's objectives in accepting a monument) and *Card*, 520 F.3d at 1019-20 (same), but something of a red herring. Regardless of the issue of imputed intent, the history of the Memorial is relevant to determining its effect on the reasonable viewer. Thus, while this evidence may not be relevant to congressional purpose, it cannot be ignored in assessing the history and context of the Cross, which remains on public land. Again, simply because the Cross was transferred from the local government to the federal government does not wipe out the history of the site. The transfer did not divest the Cross of its Christian symbolism or of the long history and association of the site as one of religious significance.

at 703 (Breyer, J., concurring in the judgment) ("[T]he short (and stormy) history of the courthouse Commandments' displays [at issue in *McCreary*] demonstrates the substantially religious objectives of those who mounted them, and the effect of this readily apparent objective upon those who view them.").

The wide recognition of the Cross as a religious symbol and its long "and stormy" history of religious usage distinguishes the Memorial from the displays in *Van Orden* and *Card*. The Ten Commandments monuments at issue in those cases passed muster in part because they were *not* used as religious objects—they simply adorned the grounds of their respective government buildings in the company of other monuments. *See Van Orden*, 545 U.S. at 701 (Breyer, J., concurring in the judgment) ("[T]o determine the message that the text [of the Ten Commandments monument] here conveys, we must examine how the text is *used*.") (emphasis in original). In *Van Orden*, Justice Breyer emphasized that the organization that erected the Ten Commandments monument "sought to highlight the Commandments' role in shaping civic morality as part of that organization's efforts to combat juvenile delinquency." *Id.* at 701. Given the Monument's history and use in those cases, a reasonable viewer would not have inferred from the use of the monuments that their function was religious in nature. By contrast, a reasonable observer of the Memorial would be aware of the long history of the Cross, and would know that it functioned as a holy object, a symbol of Christianity, and a place of religious observance. The Cross's religious history heightens, rather than neutralizes, its "undeniably . . . religious message." *See id.* (finding that although the text of the Ten Commandments "undeniably has a religious message," that message did not predominate in the display because the text was not used in a sectarian manner); *see also Eckels*, 589 F. Supp. at 235 ("[T]hat the effect of the symbols' presence is religious is evidenced by what the site has been used for since the [cross was] constructed [including

Easter sunrise services]. There is nothing remotely secular about church worship.").

**[16]** The fact that the Memorial also commemorates the war dead and serves as a site for secular ceremonies honoring veterans cannot overcome the effect of its decades-long religious history. *See Jewish War Veterans*, 695 F. Supp. at 5, 13-14 (holding that religious symbolism of a Latin cross and use of cross in religious ceremonies rendered it unconstitutional even though it had been dedicated as a war memorial). Although the Memorial was labeled a war memorial in 1954, for almost three decades—during which it served primarily as a site of religious observance—the Memorial consisted of only the Cross, with no physical indication of any secular purpose. Further, recognition of the Memorial as a tribute to veterans has usually been coupled with Christian ceremonies and statements about the Cross's religious significance. The simultaneous invocation of the Cross as a tribute to veterans and a "gleaming white symbol of Christianity" lends a distinctly sectarian tone to the Memorial's secular message of commemoration. *See Carpenter*, 93 F.3d at 631 (holding cross was not constitutional in part because its secular history was "intertwined with its religious symbolism"). The Memorial's relatively short history of secular usage does not predominate over its religious functions so as to eliminate the message of endorsement that the Cross conveys. *See Van Orden*, 545 U.S. at 701-03.

**[17]** La Jolla—where the Memorial is located and serves as a prominent landmark—has a history of anti-Semitism that reinforces the Memorial's sectarian effect. The record contains various documents reporting "long-standing, culturally entrenched anti-Semitism" in La Jolla from the 1920s through about 1970. The details of this history are well documented in a study that is part of the district court record.[20] *See* Mary

---

[20]The district court stated that there "is no history of religious discrimination" surrounding the Memorial. Presumably the district court was refer-

Ellen Stratthaus, *Flaw in the Jewel: Housing Discrimination Against Jews in La Jolla, California*, 84 AM. JEWISH HISTORY 3, 189-219 (1996). The anti-Semitism manifested itself in various forms but "most prominently in the housing market." Until the late 1950s, Jews were effectively barred from living in La Jolla by a combination of formal and informal housing restrictions. La Jolla was forced to abandon these restrictions in 1959, in order to persuade the University of California to open a new campus—the University of California San Diego. The aura of anti-Semitism, however, continued at least through the 1960s. An informed observer is far more likely to see the Memorial as sending a message of exclusion against this backdrop than if it had been erected in a city without this pointed history.

**[18]** La Jolla's anti-Semitic history also informs our conclusion that the historical lack of complaint about the Memorial is not a determinative factor in this case. *See Van Orden*, 545 U.S. at 702-03 (Breyer, J., concurring in the judgment). In *Van Orden*, there was little to explain why there had been no complaints about the Ten Commandments monument other than the hypothesis that people had not been especially bothered by it. Here, the Memorial stood in the heart of a largely homogenous and exclusionary community. Even the government's expert noted that, for residents of La Jolla, being religious meant "by definition, without really thinking about it as inclusive or exclusive today, [ ] being Christian."

---

ring to the fact that there is no evidence of non-Christian groups requesting to use the Memorial and being denied access on the basis of their faith. We agree with the district court that there is no evidence of this type of religious discrimination, although we also note that there is hardly an extensive record of non-Christian religious events taking place at the site. More importantly, there *is* extensive evidence of religious discrimination in La Jolla, unrefuted by the government. Given that the Cross was constructed in La Jolla with a distinctly religious purpose, by La Jolla residents, during the height of this discriminatory period, we cannot ignore that such discrimination is part of the Memorial's history and context and informs the reasonable observer's views.

The Association's President noted that residents thought the site was primarily religious, although, in his view, it was primarily a veterans memorial. Under these circumstances, a lack of complaints from the minority population is hardly reflective of the lack of controversy.

As it turns out, the record indicates that the first questions about the constitutionality of the Memorial arose in 1969 or 1970, less than a decade after La Jolla real estate was opened up to Jews (and other minorities). This sequence of events lends support to the argument that the discriminatory housing policies of La Jolla may have stifled complaints about the Memorial early in its lifetime.[21] In any case, the Memorial has been the subject of continuous and heated litigation and political controversy for the last twenty years. However one assesses the early years, the Cross has long since become a flashpoint of secular and religious divisiveness.

Moreover, the suggestion that the longevity and permanence of the Cross diminishes its effect has no traction. As the Seventh Circuit explained in *Gonzales*,

> We believe this argument is much like [saying] the longer the violation, the less violative it becomes. The longer the cross is displayed in the Park, the

---

[21]The district court discounted an article reporting the story of early questions about the Memorial's constitutionality. Again, the court appeared to be weighing evidence rather than crediting it to the non-moving party. In any event, the article documents that "[a]round 1969 or 1970, the church-state question arose," and a member of the San Diego City Council "took up the cause and researched the legal status of the cross," ultimately determining that it did not violate the Establishment Clause. The article goes on to describe certain steps taken to "blunt any possible legal challenges" and quotes a La Jolla municipal employee as saying "the church-state question has come up." None of this suggests that a debate was raging over the Memorial in the 1960s and '70s, but it certainly shows that the constitutionality of the Memorial was questioned during that period, seriously enough that the Association took action to ward off litigation.

more the effect is to memorialize rather than sermonize. We do not accept this sort of bootstrapping argument as a defense to an Establishment Clause violation, nor have we found any other case that adopted this reasoning.

4 F.3d at 1422.

**[19]** Overall, a reasonable observer viewing the Memorial would be confronted with an initial dedication for religious purposes, its long history of religious use, widespread public recognition of the Cross as a Christian symbol, and the history of religious discrimination in La Jolla. These factors cast a long shadow of sectarianism over the Memorial that has not been overcome by the fact that it is also dedicated to fallen soldiers, or by its comparatively short history of secular events.

### 3.   The Memorial's Physical Setting

**[20]** The Memorial's physical setting amplifies the message of endorsement and exclusion projected by its history and usage. Despite the recent addition of secular elements, the Cross remains the Memorial's central feature. The Cross physically dominates the site. It weighs twenty-four tons, stands forty-three feet tall on its base, and is visible from many more locations and perspectives than the Memorial's secular elements. The Cross is placed in a separate, fenced off box, which highlights it, rather than incorporates it as a natural part of the Memorial.

**[21]** The engraved plaques and paving stones ring the hill on which the Cross sits, placed literally in the Cross's shadow.[22]

---

[22]In holding that the Memorial's secular elements predominated, the district court emphasized that there were far more secular objects in the Memorial than religious ones. Our evaluation of the Memorial's setting, however, cannot rest on the total number of secular versus religious ele-

The relationship of the Cross to the Memorial's secular features inverts the relationship between religious and secular that was presented in *County of Allegheny*. There, the forty-five foot tall secular Christmas tree was "clearly the predominant element of the city's display," occupying the central position in the display and towering over the eighteen foot menorah placed to one side. *County of Allegheny*, 492 U.S. at 617 (opinion of Blackmun, J.). The Supreme Court found that the display did not convey a religious message. *Id.* at 635 (O'Connor, J., concurring in part and in the judgment). Here, just the opposite is true: The way in which the Cross overshadows the Memorial's secular aspects presents a strongly sectarian picture. *See id.* at 617 (opinion of Blackmun, J.) (explaining that because the Christmas tree overshadowed the menorah, it was "sensible to interpret the meaning of the menorah in light of the tree, rather than vice versa"); *id.* at 598-99 (finding that crèche conveyed religious message because "nothing in the context of the display," including the secular flower wreath, "detracts from the crèche's religious message"); *see also City of St. Charles*, 794 F.2d at 267 (holding cross in a multi-faceted Christmas display unconstitutional and noting that the cross was "an overpowering feature of the . . . decorations . . . and . . . there [was] no taller object in the city's Christmas display"). A reasonable observer would view the Cross as the primary feature of the Memorial, with the secular elements subordinated to it. It is the cross that catches the eye at almost any angle, not the memorial plaques.

From the perspective of drivers on Interstate 5, almost directly below, the Cross is the *only* visible aspect of the Memorial, and the secular elements cannot neutralize the

---

ments. Our analysis is not a numbers game. Rather, we must examine the primary *effect* of the Memorial's various elements, to determine whether they convey a secular or religious message. Here, the Memorial's religious element—the Cross—is by far its most prominent and dominant feature, completely eclipsing the more numerous plaques and bollards sitting beneath it.

appearance of sectarianism. For these drivers, the Cross does not so much present itself as a war memorial, but rather as a solitary symbol atop a hill. In fact, the Cross is the only element of the Memorial that can be seen from *anywhere* except the site of the Memorial itself—including from Interstate 15, which is much farther from Mount Soledad than Interstate 5.

As we explained in *Ellis*, the fact that the "Cross stands as the focal point of the park, visible to those looking at the hill from a substantial distance" contributes to its sectarian effect. 990 F.2d at 1527; *see also Buono*, 371 F.3d at 549 (highlighting the fact that cross is visible to vehicles on adjacent road from 100 yards away); *American Atheists*, 616 F.3d at 1160 (finding that secular elements of the highway crosses did not diminish the message of endorsement in part because "a motorist driving by one of the memorial crosses . . . may not notice . . . the biographical information . . . [but] is bound to notice the preeminent symbol of Christianity"); *Gonzales*, 4 F.3d at 1414 (finding cross unconstitutional and noting that it "is located in an area . . . which borders a busy intersection . . . [and] is visible to virtually anyone who passes through"); *Raburn County Chamber of Commerce, Inc.*, 698 F.2d at 1101, 1111 (holding illuminated cross erected at the top of a mountain in a local state park unconstitutional and noting that it "[shines] over the North Georgia mountains" and "is visible for several miles from the major highways"). Although the Cross is located miles from downtown, it is located at the highest point in La Jolla—a place of particular prominence in San Diego.[23] *See Ellis*, 990 F.2d at 1527.

---

[23]The district court held that the distance between the Memorial and government buildings weighed against a finding of endorsement, noting that the Memorial was "an unlikely place for government indoctrination." The proximity of a religious display to government buildings is not dispositive as to constitutionality. We impute to the reasonable observer the awareness that the Memorial sits on public land. Whether identified by the public as city or federal land, it is well known that the site is a public park.

The centrality and prominence of the Cross in the Memorial distinguishes the Memorial from other war memorials containing crosses. For example, the Argonne Cross and the Canadian Cross of Sacrifice at Arlington National Cemetery and the Irish Brigade Monument at Gettysburg are located among the many secular monuments in those memorials. The crosses are on equal footing with these other monuments and do not dominate the landscape. The constitutionality of these crosses is not before us and we do not question their legitimacy. Their setting, however, is reflective of how crosses are incorporated within a larger memorial setting. That a cross may be permissible when it is merely one facet of a large, secular memorial in which it does not hold a place of prominence does not speak to the constitutionality of a cross that is the centerpiece of and dominates a memorial, the secular elements of which are subordinated to the cross. Faced with such a cross, a reasonable observer would perceive a sectarian message of endorsement.

In addition to overshadowing the Memorial's secular elements, the Cross's central position within the Memorial gives it a symbolic value that intensifies the Memorial's sectarian message. The Memorial's secular elements—the plaques, paving stones and bollards—represent specific individuals or groups of veterans, but the Cross, at the center of the Memorial, is meant to represent *all* veterans, regardless of their faith. The Cross, however, is the "preeminent symbol"—a "gleaming white symbol"—of one faith, of Christianity. The particular history of this Cross only deepens its religious meaning. The Cross is not only a preeminent symbol of Christianity, it has been *consistently used* in a sectarian manner. As even the government's expert noted, "over time . . . Mount Soledad and its cross became a . . . Christian site." The Cross's history casts serious doubt on any argument that it was intended as a generic symbol, and not a sectarian one. *See Raburn County Chamber of Commerce, Inc.*, 698 F.2d at 1110-11 (finding that dedication of cross at Easter service and

Easter services occurring at the cross were evidence that cross was erected for a religious purpose).

[22] The use of such a distinctively Christian symbol to honor all veterans sends a strong message of endorsement and exclusion. It suggests that the government is so connected to a particular religion that it treats that religion's symbolism as its own, as universal. To many non-Christian veterans, this claim of universality is alienating. As one World War II veteran who fought in both D-Day and the Battle of the Bulge put it:

> I don't know if it is a Christian monument, but it does not speak for me. I was under Hitler and in a concentration camp and a cross does not represent me. The Cross does not represent all veterans and I do not know how they can say it represents all veterans. I do not think a cross can represent Jewish veterans.

One of the plaintiffs, Steve Trunk, explained that he was "a veteran who served his country during the Vietnam conflict [but] I am not a Christian and the memorial sends a very clear message to me that the government is honoring Christian war veterans and not non Christians."[24] *See also City of St. Charles*, 794 F.2d at 273 ("[T]he story of the death and resurrection of Christ, the story that the cross calls to mind, moves only Christians deeply.").

By claiming to honor all service members with a symbol that is intrinsically connected to a particular religion, the government sends an implicit message "to nonadherents that they are outsiders, not full members of the political community, and an accompanying message to adherents that they are insiders, favored members of the political community." *See*

---

[24]We note that not all veterans agree, and that a local Jewish veterans group opposes the effort of the national group to challenge the Cross.

*Lynch*, 465 U.S. at 688 (O'Connor, J., concurring); *see also American Atheists*, 616 F.3d at 1160-61 ("[T]he fact that all of the fallen . . . troopers are memorialized with a Christian symbol conveys a message that there is some connection between [the state] and Christianity. . . . [T]he significant size of the cross would only heighten this concern."); *Eckels*, 589 F. Supp. at 235 (the primary effect of crosses and Stars of David used as war memorials "is to give the impression that only Christians and Jews are being honored by the country"). This message violates the Establishment Clause.[25]

**[23]** Accordingly, after examining the entirety of the Mount Soledad Memorial in context—having considered its history, its religious and non-religious uses, its sectarian and secular features, the history of war memorials and the dominance of the Cross—we conclude that the Memorial, presently configured and as a whole, primarily conveys a message of government endorsement of religion that violates the Establishment Clause. This result does not mean that the Memorial could not be modified to pass constitutional muster nor does it mean that no cross can be part of this veterans' memorial. We take no position on those issues.

We reverse the grant of summary judgment to the government and remand for entry of summary judgment in favor of the Jewish War Veterans and for further proceedings consistent with this opinion.

REVERSED AND REMANDED.

---

[25]The fact that individual veterans can purchase plaques representing their own beliefs does not cure the constitutional problem with the Memorial. The Memorial appears to represent Christian veterans generally, even if non-Christian veterans can take steps to be honored specifically. Simply purchasing a single small plaque with a Star of David would do little to mute the overall effect of the Cross.

## APPENDIX A





