GREGORY, Chief Judge, concurring in part and dissenting in part: I agree with the majority’s holding that Appellants have standing under 42 U.S.C. § 1983 to bring this action for a violation of the Establishment Clause. But I disagree with the majority’s ultimate conclusion that the display and maintenance of the war memorial in this case violates the Establishment Clause. I therefore respectfully dissent in part. I. The Establishment Clause provides that “Congress shall make no law respecting an establishment of religion.” U.S. Const, amend. I. To properly understand and apply the Establishment Clause, it must be viewed “in the light of its history and the evils it was designed forever to suppress.” Everson v. Bd. of Educ., 330 U.S. 1, 14-15, 67 S.Ct. 504, 91 L.Ed. 711 (1947). The early colonization of America was a time marked with religious persecution. Immigrating settlers fled religious suppression in Europe only to be met with similar treatment in America. “[M]en and women of varied faiths who happened to be in a minority in a particular locality were persecuted because they steadfastly persisted in worshipping God only as their own consciences dictated.” Id. at 10, 67 S.Ct. 504. Those regarded as nonconformists were required “to support government-sponsored churches whose ministers preached inflammatory sermons, designed . to strengthen and consolidate the established faith by generating a burning hatred against dissenters.” Id. The Establishment Clause was intended to combat the practice of “compel[ling individuals] to support and attend government favored churches.” Id. at 8, 67 S.Ct. 504; accord Myers v. Loudoun Cty. Pub. Sch., 418 F.3d 395, 402 (4th Cir. 2005). The Clause’s historical' setting reveals that “Kits first and most immediate purpose rested on the belief that a union of government and religion tends to destroy government and to degrade religion.” Engel v. Vitale, 370 U.S. 421, 431, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1962). The realization of its goal meant that the government must “‘neither engage in hor compel religious practices,’ that it must ‘effect no favoritism among sects or between religion and non-religion,’ and that it must ‘work deterrence of no religious belief.’ ” Van Orden v. Perry, 545 U.S. 677, 698, 125 S.Ct. 2854, 162 L.Ed.2d 607 (2005) (Breyer, J., concurring) (plurality opinion) (quoting Abington School Dist. v. Schempp, 374 U.S. 203, 205, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963) (Goldberg, J., concurring)). But the Clause does not require the government “to purge from the public sphere” any reference to religion. Id. at 699, 125 S.Ct. 2854. “Such absolutism is not only inconsistent with our national traditions, but would also tend to promote the kind of social conflict the Establishment Clause seeks to avoid.” Id. (citations omitted). While neutrality may.be the “touchstone” of the Establishment Clause, it more so serves as a “sense of direction” than a determinative test. McCreary Cty. v. Am. Civil Liberties Union, 545 U.S. 844, 125 S.Ct. 2722, 162 L.Ed.2d 729-(2005). We cannot view neutrality as some sort of “brooding and pervasive devotion to the secular and a passive, .or even active, hostility to the religious.” Schempp, 374 U.S. at 306, 83 S.Ct. 1560 (Goldberg, J., concurring). Thus, in reviewing the challenged war memorial, this Court must seek general rather than absolute neutrality. We do so by engaging in the three-factor analysis delineated in Lemon v. Kurtzman (the “Lemon test”), which requires that the memorial have a secular purpose; have a principal or primary effect, that neither advances, inhibits, nor endorses religion; and not foster “an excessive government entanglement with religion.” 403 U.S. 602, 612-13, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971). The memorial “must satisfy each of the Lemon test’s three criteria” to pass constitutional muster. Lambeth v. Bd. of Comm’rs of Davidson Cty., 407 F.3d 266, 269 (4th Cir. 2005) (citing Mellen v. Bunting, 327 F.3d 355, 367 (4th Cir. 2003)). II. A. I will briefly reiterate the operative facts. In Bladensburg, Maryland, in a median at the intersection of Maryland Route 450 and U.S. Route 1, stands a war memorial consisting of a forty-foot-tall concrete Latin cross (the “Memorial”). The Memorial and the median are currently owned by Appellee Maryland-National Capital Park and Planning Commission (the “Commission”). Intervenor-Appellee American Legion’s symbol is displayed in the middle of the cross on both faces. The cross sits on a base and includes a plaque that lists the names of the forty-nine Prince George’s County residents who died in World War I. J.A. 1891. The plaque also states, “THIS MEMORIAL CROSS DEDICATED TO THE HEROES OF PRINCE GEORGE’S COUNTY MARYLAND WHO LOST THEIR LIVES IN THE GREAT WAR FOR THE LIBERTY OF THE WORLD,” and includes a quotation from President Woodrow Wilson. Id. Also, each face of the base is inscribed with one of four words: “VALOR,” “ENDURANCE,” “COURAGE,” and “DEVOTION.” J.A. 1963. In 1918, a group of private citizens led the charge to construct and finance the Memorial. The donors signed a pledge stating that they, “trusting in God, the Supreme Ruler of the universe,” pledged their faith in the forty-nine war dead, whose spirits guided them “through life in the way of godliness, justice, and liberty.” J.A. 1168. The group also circulated a fundraising flyer stating, Here, those who come to the Nation’s Capital to view the wonders of its architecture and the sacred places where their laws are made and administered may, before this Cross, rededicate[] themselves to the principles of their fathers and renew the fires of patriotism and loyalty to the nation which prompted these young men to rally to the defense of the right. And here the friends and loved ones of those who were in the great conflict will pass daily over a highway memorializing their boys who made the supreme sacrifice. J.A. 2303. A groundbreaking ceremony was held for the Memorial and for Maryland Route 450 (then known as the National Defense Highway) in late 1919. Several local officials spoke about the fallen soldiers and how both the Memorial and highway would commemorate their bravery and sacrifice. But the private group ultimately failed to raise enough money to construct the Memorial and abandoned the project. The local post of the American Legion, a con-gressionally chartered veterans service organization, then took up the task and completed the Memorial on July 25,1925. That day, the post held a ceremony which included multiple speeches regarding the Memorial’s representation of the men who died fighting for this country and an invocation and benediction delivered by local clergymen. Over time, additional monuments honoring veterans were built near the Memorial (known as the “Veterans Memorial Park”). Because the Memorial sits in the middle of a median and is separated by a busy highway intersection, the closest additional monument is about 200 feet away. Since the Memorial’s completion, numerous events have been hosted there to celebrate Memorial Day, Veterans Day, the Fourth of July, and the remembrance of September 11th. These ceremonies usually include an invocation and benediction, but the record demonstrates that only three Sunday religious services were held at the Memorial—all of which occurred in August 1931. J.A. 347. Due to increasing traffic on the highway surrounding it, the Commission acquired the Memorial and the median where it is located from the American Legion in March 1961. Since that time, the Commission has spent approximately $117,000 to maintain and repair the Memorial. In 2008, it set aside an additional $100,000 for renovations, of which only $5,000 has been spent as of 2015. J.A. 562-65. On February 25, 2014, more than fifty years after the Memorial passed into state ownership, Appellants initiated this suit against the Commission under 42 U.S.C. § 1983 alleging a ■violation of the Establishment Clause. B. By concluding that the Memorial violates the Establishment Clause, the majority employed the Lemon test “with due consideration given to the factors outlined in Van Orden.” Maj. Op. at 206. In Van Orden, a plurality of the Supreme Court determined that the Lemon test was not useful when evaluating a “passive monument.” 545 U.S. at 686, 125 S.Ct. 2854. Instead, the Court’s analysis was “driven both by the nature of the monument and by our Nation’s history.” Id. As the majority recognizes, Justice Breyer’s concurrence is the controlling opinion in Van Orden. Maj. Op. at 204-05. Justice Breyer states that the Court’s Establishment Clause tests, such as Lemon, cannot readily explain the Clause’s tolerance of religious activities in “borderline cases,” as there is “no single mechanical formula that can accurately draw the constitutional line in every case.” Van Orden, 454 U.S. at 699-700, 102 S.Ct. 805 (Breyer, J., concurring). “If the relation between government and religion is one of separation, but not of mutual hostility and suspicion, one will inevitably find difficult borderline cases.” Id. at 700, 102 S.Ct. 805. Instead of applying Lemon to the challenged Ten Commandments display, Justice Breyer exercised his “legal judgment” and evaluated the context of the display and how the undeniably religious text of the Commandments was used. Id. at 700-04, 102 S.Ct. 805. His concurrence, however, also noted that Lemon provides a “useful guidepost[]— and might well lead to the same result”— for “no exact formula can dictate a resolution to such fact-intensive cases.” Id. at 700, 102 S.Ct. 805. Relying on Lemon, and drawing guidance from Van Orden, the majority determined that the Commission articulated a legitimate secular purpose for displaying the Memorial. Nevertheless, the majority concluded that the Memorial failed Lemon’s second and third factors, finding that a reasonable observer would conclude that the Memorial has the primary effect of endorsing religion and the Commission’s maintenance of the Memorial constitutes excessive entanglement with religion. In my view, the majority misapplies Lemon and Van Orden to the extent that it subordinates the Memorial’s secular history and elements while focusing on the obvious religious, nature of Latin crosses themselves; constructs a reasonable observer who ignores certain elements of the Memorial and reaches unreasonable conclusions; and confuses maintenance of a highway median and monument in a state park with excessive religious entanglement. . III. Because Appellants do not challenge the district court’s finding that the Commission has demonstrated a secular purpose for displaying and maintaining the Memorial (the first Lemon factor), I will discuss in turn the majority’s evaluation of the second and third Lemon factors—whether the Memorial has the primary effect of advancing or inhibiting religion and whether the government is excessively entangled with religion. A. Under Lemon’s second factor, we must determine “whether a particular display, with religious content, would cause a reasonable observer to fairly understand it in its particular setting as impermissibly advancing or endorsing religion.” Lambeth, 407 F.3d at 271. This reasonable observer inquiry “requires the hypothetical construct of an objective observer who knows all of the pertinent facts and circumstances surrounding the [display] and its placement.” Salazar v. Buono, 559 U.S. 700, 721, 130 S.Ct. 1803, 176 L.Ed.2d 634 (2010) (plurality opinion). We should, not ask “whether there is any person who could find an endorsement of religion, whether some people may be offended by the display, or whether some reasonable person might think the State endorses religion.” Capitol Square Review & Advisory Bd. v. Pinette, 515 U.S. 753, 780, 115 S.Ct. 2440, 132 L.Ed.2d 650 (1995) (O’Connor, J., concurring) (internal quotation marks omitted). Instead, we.must determine “whether .., the display’s principal or primary effect is to advance or inhibit religion; or, put differently, whether an informed, reasonable observer would view the display as an endorsement of religion.” Lambeth, 407 F.3d at 272. It is undeniable that the Latin cross is the “preeminent symbol of Christianity.” Maj. Op. at 206. But we must be careful not to “focus exclusively on the religious component” of a display, as that “would inevitably lead to its invalidation under the Establishment Clause.” Lambeth, 407 F.3d at 271 (quoting Lynch v. Donnelly, 465 U.S. 668, 680, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984)). Indeed, the Supreme Court “has consistently concluded that displays with religious content—but also with a legitimate secular use—may be permissible under the Establishment Clause.” Id. (citing Cty. of Allegheny v. Am. Civil Liberties Union, 492 U.S. 573, 579, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989)). A reasonable observer would be aware. that the cross is “not merely a reaffirmation of Christian beliefs,” for it is “often used to honor and respect those whose heroic acts, noble contributions, and patient striving help secure an honored place in history for this Nation and its people.” Buono, 559 U.S. at 721, 130 S.Ct. 1803. Despite the religious nature of the Latin cross, a reasonable observer must also adequately consider the Memorial’s physical setting, history, and usage. The Memorial was created to commemorate the forty-nine soldiers who lost their lives in World War I, as explicitly stated on the plaque attached to its base. See J.A. 1891 (“THIS MEMORIAL CROSS DEDICATED TO THE HEROES OF PRINCE GEORGE’S COUNTY, MARYLAND WHO LOST THEIR LIVES IN THE GREAT WAR FOR THE, LIBERTY OF THE WORLD.”). The plaque also includes a quotation from President Woodrow Wilson stating, “The right is more precious than peace. We shall fight for the things we have always carried nearest our hearts. To such a task we dedicate our lives.” Id. Each face of the cross includes the American Legion seal and each face of the base is inscribed with one of four words: “VALOR,” “ENDURANCE,” “COURAGE,” and “DEVOTION.” J.A. 1963. The Memorial has functioned as a war memorial for its entire history, and it sits among other secular monuments in Veterans Memorial Park, though it is separated from the other monuments byintersecting highways. The majority concludes that the size of the Latin cross making up the Memorial overwhelms these secular elements. In the majority’s view, the Memorial is unconstitutional based predominantly on the size of the cross, and neither its secular features nor history could overcome the presumption. But such a conclusion is contrary to our constitutional directive. We must fairly weigh the appearance, context, and factual background of the challenged display when deciding the constitutional question. See Lynch, 465 U.S. at 679-80, 104 S.Ct. 1355; Cty. of Allegheny, 492 U.S. at 598-600, 109 S.Ct. 3086. Although a reasonable observer would properly notice the Memorial’s large size, she would also take into account the plaque, the American Legion symbol, the four-word inscription, its ninety-year history as a war memorial, and its presence within a vast state park dedicated to veterans of other wars. Would the majority’s version of a reasonable observer be satisfied and better equipped to evaluate the Memorial’s history and context if the cross were smaller? Perhaps if it were the same size as the other monuments in the park? Though Establishment Clause cases require a fact-intensive analysis, we must bear in mind our responsibility to provide the government and public with notice of actions that violate the Constitution. What guiding principle can be gleaned from- the majority’s focus on the cross’s size? Understandably, the majority’s decision would lead to per se findings that all large crosses are unconstitutional despite any amount of secular history and context, in contravention of Establishment Clause jurisprudence. The majority also makes much of the Memorial’s isolation from the other monuments in Veterans Memorial Park, as it sits in the median of a now busy highway, making it difficult to access. But a reasonable observer would note' that the Memorial was placed there as part of the concurrent creation of the National Defense Highway to commemorate the soldiers of World War I, not as a means of endorsing religion. And, though Veterans Memorial Park does not include any other religious symbols as memorials, there is no evidence that the state formally foreclosed the possibility of erecting'any other religious symbol. Also, the reasonable observer would note that the Memorial’s physical setting does not lend itself to any religious worship. Van Orden, 545 U.S. at 702, 125 S.Ct. 2854 (stating that religious display’s location in large park containing other monuments suggested “little or nothing sacred,” as it illustrated residents’ historical ideals and “did not readily lend itself to meditation or any other religious activity”). Additionally, due to the Memorial’s location, the majority explains that a reasonable observer would not be able to easily examine the Memorial’s secular elements. Maj, Op. at 209. This is because the Memorial “is located'in a high-traffic area and passers-by would likely be unable to read the plaque,” which is small and badly weathered. Id. at 209. However, the reasonable, observer’s knowledge is not “limited to the information gleaned simply from viewing the challenged display.” Pinette, 515 U.S. at 780-81, 115 S.Ct. 2440 (O’Connor, J., concurring). That the average person in the community may have difficulty viewing all of the secular elements of the Memorial while stuck in traffic or driving at high speeds is of no consequence, for the reasonable observer “is not to be identified with any ordinary individual, ... but is rather a personification of a community ideal of reasonable behavior” who is “deemed aware of the history and context of the community and forum in which the religious display appears.” Id. at 779-80, 115 S.Ct. 2440 (internal quotation marks and citations omitted). Thus, the reasonable observer’s ability to consider these secular elements is by no means diminished. Further, quoting Trunk v. City of San Diego, 629 F.3d 1099, 1116 n.18 (9th Cir. 2011), the majority states that the large size and isolation of the Memorial “evokes a message of aggrandizement and univer-salization of religion, and not the message of individual memorialization and remembrance that is presented by a field of gravestones.” Maj. Op. at 209. In Trunk, the Ninth Circuit considered a forty-three-foot free-standing cross and veterans memorial erected in a state park. 629 F.3d at 1101. The court evaluated the history of the Latin cross generally, its use as a war memorial, the history of the particular war memorial at issue, and its physical setting. Id. at 1102-05, 1110-24. The cross in Trunk had no secular elements; instead, it was unadorned and without any physical indication that it was a war memorial until after litigation was initiated to remove it. Id. at 1101-02; see also Smith v. Cty. of Albemarle, 895 F.2d 953, 958 (4th Cir. 1990) (concluding that creche, unassociated with any secular symbols, prominently displayed in front of government building, and unaccompanied by any other religious or nonreligious displays, conveyed message of governmental endorsement of religion). The court concluded that a reasonable observer would perceive the presence of the cross as the federal government’s endorsement of Christianity, due in part to its long history of serving as a site of religious observance, with no indication of any secular purpose for almost three decades. Id. at 1125. But here, the Memorial has always served as a war memorial, has been adorned with secular elements for its entire history, and sits among other memorials in Veterans Memorial Park. The Memorial’s predominant use has been for Veterans Day and Memorial Day celebrations, although three religious services were conducted at the Memorial nearly ninety years ago. Also, the invocations and benedictions performed at the annual veterans celebrations are not enough to cause a reasonable observer to perceive the Memorial as an endorsement of Christianity in light of its overwhelmingly secular history and context. Further, guidance from Van Orden provides that the Memorial’s ninety-year existence and fifty-year government ownership without litigation is a strong indication that the reasonable observer perceived its secular message. See 545 U.S. at 702-03, 125 S.Ct. 2854 (stating that challenged monument’s presence on government property for forty years provided determinative factor that it conveyed predominately secular message). The Memorial stands at a busy intersection, yet this case is the first time the Memorial has been challenged as unconstitutional. Those fifty years strongly suggest “that few individuals, whatever their system of beliefs, are likely to have understood the [Memorial] as amounting, in any significantly detrimental way, to a government effort ... primarily to promote religion over nonreligion,” or to “engage in,” “compel,” or deter any religious practice or beliefs. Id. at 702, 125 S.Ct. 2854 (quoting Schempp, 374 U.S. at 305, 83 S.Ct. 1560 (Goldberg, J., concurring)); see also Buono, 559 U.S. at 716, 130 S.Ct. 1803 (“Time also has played its role. [After] nearly seven decades[,] ... the cross and the cause it commemorated had become entwined in the public consciousness.”). This significant passage of time must factor into the Court’s analysis and “help[ ] us understand that as a practical matter of degree [the Memorial] is unlikely to prove divisive.” Van Orden, 545 U.S. at 702, 125 S.Ct. 2854. With the foregoing facts, circumstances, and principles in mind, I conclude that a reasonable observer would understand that the Memorial, while displaying a religious symbol, is a war memorial built to celebrate the forty-nine Prince George’s County residents who gave their lives in battle. Such an observer would not understand the effect of the Commission’s display of the Memorial—with such a commemorative past and set among other memorials in a large state park—to be a divisive message promoting Christianity over any other religion or nonreligion. A cross near a busy intersection “need not be taken as a statement of governmental support for sectarian beliefs. The Constitution does not oblige government to avoid any public acknowledgment of religion’s role in society. Rather, it leaves room to accommodate divergent values within a constitutionally permissible framework.” Buono, 559 U.S. at 718-19, 130 S.Ct. 1803 (citations omitted). We must be careful not to push the Establishment Clause beyond its purpose in search of complete neutrality. “[U]ntutored devotion to the concept of neutrality can lead to invocation or approval of results which partake not simply of that noninterference and noninvolvement with the religious which the Constitution commands,” but of extreme commitment to the secular, “or even active, hostility to the religious.” Van Orden, 545 U.S. at 699, 125 S.Ct. 2854 (quoting Schempp, 374 U.S. at 306, 83 S.Ct. 1560 (Goldberg, J., concurring)). Finding that a reasonable observer would perceive the Memorial as an endorsement of Christianity would require that we pursue a level of neutrality beyond our constitutional mandate. I therefore conclude that the Memorial does not violate the second factor of the Lemon test. B. The Lemon test’s final factor asks whether the challenged display has created an “excessive entanglement” between government and religion. Lambeth, 407 F.3d at 272-73. “The kind of excessive entanglement of government and religion precluded by Lemon is characterized by ‘comprehensive, discriminating, and continuing state surveillance.’ ” Id. at 273 (quoting Lemon, 403 U.S. at 619, 91 S.Ct. 2105). This inquiry is one of “kind and degree,” Lynch, 465 U.S. at 684, 104 S.Ct. 1355, “and because some interaction between church and state is inevitable, the Supreme Court has reaffirmed that the ‘[entanglement must be “excessive” before it runs afoul of the Establishment Clause,’ ” Koenick v. Felton, 190 F.3d 259, 268 (4th Cir. 1999) (quoting Agostini v. Felton, 521 U.S. 203, 233, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997)). The majority concludes that the Memorial fosters excessive entanglement because of the Commission’s ownership and maintenance of the Memorial. But the Commission’s maintenance of the Memorial and the land surrounding it could hardly be considered the sort of state surveillance that Lemon intends to prohibit. See Lemon, 403 U.S. at 615-20, 91 S.Ct. 2105 (concluding that challenged action excessively entangled state with religion by requiring state to supplement salaries for teachers in parochial schools); see also Mellen, 327 F.3d at 375 (determining that public university’s supper prayer violated Lemon’s third prong because school officials “composed, mandated, and monitored a daily prayer”). Rather, the Commission is merely maintaining a monument within a state park and a median in between intersecting highways that must be well lit for public safety reasons. There is no evidence that the Commission consults with any churches or religious organizations to determine who may access the Memorial for events. .Nor is there evidence that the Commission is required,to be involved in any church-related activities to maintain the Memorial. Further, the majority observes that “any use of public funds to promote religious doctrines violates the Establishment Clause.” Bowen v. Kendrick, 487 U.S. 589, 623, 108 S.Ct. 2562, 101 L.Ed.2d 520 (1988) (O’Connor, J., concurring). But, in Agostini, the Supreme Court held that a federally-funded program that paid public school teachers to teach disadvantaged children in parochial schools did not cause an excessive entanglement between church and state. 521 U.S. at 234-35, 117 S.Ct. 1997. Likewise, the Commission’s use of $122,000 over the course of fifty-plus years for lighting and upkeep is not a promotion of any religious doctrine, as the Memorial is a historical monument honoring veterans. I therefore conclude that the Memorial does not violate the third factor of the Lemon test. * * * This Memorial stands in witness to the VALOR, ENDURANCE, COURAGE, and DEVOTION of the forty-nine residents of Prince George’s County, Maryland “who lost their lives in the Great War for the liberty of the world.” I cannot agree that a monument so conceived and dedicated and that bears such witness violates the letter or spirit' of- the very Constitution these heroes died to defend. Accordingly, I would affirm the district court’s judgment.